Amy L. GARTHUS, SS # 469–68–9046, Plaintiff,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.

Civ. No. 5–92–94.

United States District Court, D. Minnesota, Fifth Division.

Sept. 13, 1993.

John E. Graves, Petersen, Sage, Cuzzo & Graves, Duluth, MN, for plaintiff.

Patricia R. Cangemi, Asst. U.S. Atty., Minneapolis, MN, for defendant.

## REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 13th day of September, 1993.

### I. *Introduction*

The Plaintiff commenced this action pursuant to Section 205(g) of the Social Security Act, Title 42 U.S.C. § 405(g), seeking a judicial review of the Secretary's final decision which denied her Application for Disability Insurance Benefits ("DIB"). The matter is presently before the Court upon cross-Motions for Summary Judgment. The Plaintiff has appeared by John E. Graves, Esq., and the Defendant has appeared by Patricia R. Cangemi, Assistant United States Attorney.

For reasons which follow, we recommend that the Plaintiff's Motion for Summary Judgment be granted.

### II. *Procedural History*

On October 30, 1990, the Plaintiff filed an application for a period of disability and for DIB, alleging the onset of disability on April 25, 1989, as a result of neck and back impairments. Under the provisions of the Social Security Act, the Plaintiff's insured status expired on December 31, 1990.

Her application was denied initially on November 30, 1990, and upon reconsideration on March 8, 1991. She requested an Administrative Hearing, which was held on July 16, 1991, before Administrative Law Judge Harry L. Malloy ("ALJ"). During the course of that Hearing, at which the Plaintiff was represented by counsel, the Plaintiff and a Vocational Expert ("VE") testified. On August 13, 1991, the ALJ rendered a decision in which he determined that the Plaintiff was not entitled to a period of disability from April 25, 1989 to December 31, 1990, nor was she disabled at any other time through the date of his decision.

The Appeals Council denied the Plaintiff's request for administrative review on April 30, 1992, and the ALJ's determination become the final decision of the Secretary. *Nelson v. Sullivan,* 966 F.2d 363, 366 (8th Cir.1992); *Browning v. Sullivan,* 958 F.2d 817, 821 (8th Cir.1992); *20 C.F.R. § 404.981.*

This action was commenced on June 23, 1992.

### III. *Factual Background and Chronology*

At the time of the Hearing, the Plaintiff was 28 years of age, was approximately 5'4" tall, weighed about 140 pounds, and was married with two children. She had a high school education and, in addition, she had completed the training and certification requirements for becoming a Certified Nursing Assistant ("C.N.A.") through a nursing facility in Duluth, Minnesota.

The Plaintiff's past relevant employment history included intermittent work as a

C.N.A. for Lake Haven Manor, Field View Manor, and the Benedictine Health Center, where she was employed at the time of her alleged date of onset. Her duties at these facilities included lifting, transferring residents, making beds and caring for bedside stands, and toileting. She also had worked as a counter clerk at various fast-food restaurants for a short period of time, where her jobs required continuous standing, cleaning, stocking shelves, and lifting up to twenty-five pounds. The Plaintiff's only other past relevant work was as an office clerk with the Air National Guard, where she answered telephones, had general secretarial duties, unpacked supplies, and transferred heavy boxes from shelf to shelf.

The Plaintiff has had a long history of scoliosis,[1] which was first detected when she was only twelve years of age. In 1975, she underwent a surgical procedure for the implantation of a Harrington Rod,[2] which entailed the insertion of a 14 inch device along her spinal column and a recuperation in a body cast for a period of 8½ months. The Harrington Rod has not been and, in all likelihood, will not ever be removed.

Following this surgery, the Plaintiff was seen on a regular basis until 1980. On August 5, 1980, her treating physician, Dr. Mysliwiec, reported that the Plaintiff was complaining of low back discomfort, which arose late in the day and which was relieved by sleeping with a pillow tucked by her stomach. The Plaintiff was advised not to sleep on her stomach, and was told that her back would gradually get better over time.

Between 1980 and 1989, the Plaintiff's only record of treatment was in 1987, for minor neck strain on her left side, and for which she was seen by her personal physician, Dr. M.J. Hieb.

On April 22, 1989, the Plaintiff suffered an injury at the Benedictine Health Center while she was lifting a patient during the course of her work duties. On April 25, 1989, she visited Dr. William Fleeson, complaining of a severe burning sensation across the mantle of the trapezius, severe aching in the neck and along both sides of the head, and severe and upper extremity discomfort upon motion. The Plaintiff advised Dr. Fleeson that she had continued to work for the remainder of the day, including some lifting, following her injury. She complained of having discomfort while sitting, including low back pain, and pain throughout the entire spine and around to her hips and thighs. While not specifying any other occurrences or injuries, she told Dr. Fleeson that her low back problem had been "building up." [T. 212].

Upon examination, Dr. Fleeson found virtually no neck motion in any plane, and moderately severe tenderness. Low back testing revealed flexion of only five degrees, and no extension. The Plaintiff was unable to lie on her back to be examined because of her severe discomfort. While standing, her examination showed truncal flexion of only 30°, and no extension. Dr. Fleeson was unable to conduct further testing because the Plaintiff became severely light-headed and required smelling salts. Robaxin[3] and Tylenol[4] were prescribed.

On April 27, 1989, a cervical Magnetic Resonance Imaging ("MRI") Scan was conducted by Dr. Stephen Towle, who found no disc protrusion or cord compression at C3–4 or C6–7. However, the MRI did reveal two acute cervical disc herniations. At C4–5, he noticed a small central disc protrusion that did not appear to compress against the spinal

---

1. Derived from the Greek word for "curvation", scoliosis is an appreciable lateral deviation in the normally straight vertical line of the spine. *Dorland's Illustrated Medical Dictionary*, p. 1497 (27th Ed.1988).

2. Harrington instrumentation is a system of metal hooks and rods inserted surgically in the posterior elements of the spine to provide distraction and compression in treatment of scoliosis and other deformities. *Dorland's Illustrated Medical Dictionary*, p. 842 (27th Ed.1988).

3. Robaxin is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions. *Physicians' Desk Reference*, p. 1872 (46th Ed.1992).

4. Tylenol provides temporary relief for minor aches, pains, headaches and fevers. *Physicians' Desk Reference*, p. 1367 (46th Ed.1992).

cord. At C5–6, the doctor found a disc protrusion which did "significantly efface the ventral and right ventral lateral subarachnoid space." [T. 209]. According to the MRI scan, this protrusion caused some posterior bowing of the exiting right fifth root.

On May 1, 1989, the Plaintiff returned to Dr. Fleeson, with complaints of continued, moderately severe discomfort. Objective testing again detected virtually no neck motion, but muscle spasm and moderate tenderness over the posterior neck were exhibited. Gentle physical therapy was to be commenced.

On May 8, 1989, Dr. Christian Peterson conducted an MRI of the Plaintiff's lumbar spine. No evidence of nerve root compression was found in the neural canals at any lumbar level. At L3–4, small facet joint effusions were present, but no abnormalities which would significantly compress the neural structures were noted.

On her next visit to Dr. Fleeson, on May 10, 1989, he diagnosed a low lumbar facet syndrome [5] based upon his interpretation of the MRI. Tests of the upper extremities showed some decreased range of motion, due to pain in the right trapezius. The Plaintiff complained of a constant throbbing pain in the midline of the neck, and quite a bit of pain in her lower back. Flexeril [6] was prescribed.

On May 16, 1989, the Plaintiff contacted Dr. Fleeson and reported significant pain and nausea during her physical therapy sessions. As a result, her therapy sessions were temporarily discontinued.

On May 19, 1989, the Plaintiff reported to Dr. Fleeson that she could no longer continue physical therapy. She stated that, after treatment, she would remain on hot packs for an excessive period of time, and would experience serious soreness and headaches which lasted throughout the week. She felt that her condition was worsening. Dr. Fleeson

noted that anesthetic injections over C6 gave the Plaintiff some relief with a better range of motion, but that the underlying discomfort was not abated. He prescribed Talacen [7] to supplement the Flexeril, which had previously been prescribed, but which, apparently, had not been used.

After treating the Plaintiff on May 19, 1989, Dr. Fleeson completed a Physical Capabilities & Duty Status form in which he concluded that the Plaintiff was not fit for work duties.

On June 2, 1989, the Plaintiff again reported constant aching in her shoulders, persistent soreness in her lower back, and pain in her upper right arm. While her neck muscle spasms had diminished, she still had an extremely limited range of motion and obvious discomfort. She had been taking the prescribed Talacen, but there was no record of her use of the Flexeril. On June 16, 1989, Dr. Fleeson observed no "remarkable" improvements in her condition, and he recommended that she remain active and, perhaps, that she should try swimming. He also regarded surgical intervention as inevitable.

On June 27, 1989, the Plaintiff was seen by Dr. Lonstein, a physician in the hospital where she had received her Harrington Rod implantation in 1975, for a scheduled evaluation. Dr. Lonstein detected evidence of cervical disc protrusions and recommended a non-operative treatment that would consist of an intensive exercise program involving neck and abdominal exercises.

The Plaintiff returned to Dr. Fleeson on July 13, 1989, on a "semi-urgent basis." With a tone of indignation, Dr. Fleeson pledged to personally arrange for an immediate surgical evaluation, and he commented as follows:

> She did of course see Dr. Lonstein in the Cities, and he apparently simply had her seen by a physical therapist! Even more,

5. By the Plaintiff's next visit on May 19, 1989, this diagnosis had been modified to describe a "facet syndrome in the lumbosacral spine with degenerative disc disease". [T. 200].

6. Flexiril is indicated as an adjunct to rest and physical therapy for the relief of muscle spasm which is associated with acutely painful muscu-

loskeletal conditions. *Physicians' Desk Reference*, p. 1472 (46th Ed.1992).

7. Talacen is an analgesic which is indicated for the relief of mild to moderate pain. *Physicians' Desk Reference*, p. 2070 (46th Ed.1992).

the therapist went ahead and ordered physical therapy here in Duluth. I canceled that as I felt it would not be good for her. She comes now indicating she did in fact go ahead and have therapy! She is worsening, having more discomfort, inability to tolerate manual traction and ultrasound, etc. She is having more problems on the left side, losing feeling in the left hand and having weakness in the left hand, and continues to have severe neck discomfort as before.

[T. 194].

Dr. Fleeson's referral resulted in the immediate treatment of the Plaintiff by a neurosurgeon, Dr. Richard Freeman, on July 14, 1989. Dr. Freeman diagnosed cervical radiculopathy (i.e., disease of the nerve roots) and myelopathy,[8] that was related to disc herniation, and he recommended an immediate anterior cervical decompression and discectomy at C4–5 and C5–6. On July 18, 1989, Dr. Freeman performed the surgery, which was consistent with his original recommendations. Following the surgery, Dr. Freeman prescribed Flexeril and Hydrocet.[9]

On August 10, 1989, the Plaintiff called Dr. Fleeson and complained of continued discomfort in her neck, although she had not been taking the medicines that had been prescribed by Dr. Freeman. After her discussion with Dr. Fleeson, she began taking the Flexeril, but she repeated the same complaints five days later.

The next day, on August 16, 1989, Dr. Fleeson brought the Plaintiff in for evaluation. Since the surgery, she had a couple of good days, but as she increased her activity, by baking cookies and doing laundry, she began to experience discomfort again. Dr. Fleeson did report an improved range of neck motion, with flexion and extension at about ⅓ to ½ of normal.

On September 6, 1989, the Plaintiff revisited Dr. Freeman, who recommended physical therapy to relieve the discomfort over her posterior shoulders. X-rays revealed a good incorporation of the inserted bone plugs, and the position of the bone grafts was determined to be excellent.

On September 29, 1989, the Plaintiff called Dr. Fleeson, and reported that the program of physical therapy was causing numerous headaches at the base of her neck. Rotation of the shoulders was quite painful. Dr. Fleeson recommended that the physical therapy be discontinued.

X-rays taken October 6, 1989, disclosed that the bone grafts were being incorporated into the respective disc spaces. No abnormalities were visualized which would significantly compress the neural structures.

On October 9, 1989, the Plaintiff complained to Dr. Fleeson of recurring discomfort, of persistent soreness and of experiencing headaches. During physical therapy, a therapist had pulled hard on her shoulder and that had caused here to develop severe neck pain. At that time, the Plaintiff had been taking Triavil,[10] but Dr. Fleeson recommended that the prescription be discontinued. He also noted his concern about sympathetic dystrophy and about a frozen shoulder syndrome because of her avoidance of motion. He theorized that the pain was probably not associated with her fusion.

On October 18, 1989, Dr. Freeman noticed a marked restriction in her cervical range of motion that was consistent with her recent operation. She complained of continued neck discomfort that was focalized in the posterior area at C7–T1. During physical therapy, when her right arm was brought down and to her back, she "felt as if everything were tearing in her neck." Due to her weak grasp and numbness in the fingers of her right

---

**8.** Myelopathy is a general term denoting functional disturbances and/or pathological changes in the spinal cord. The term is often used to designate nonspecific lesions, in contrast to inflammatory lesions. *Physicians' Desk Reference*, p. 1088 (46th Ed.1992).

**9.** Hydrocet is an analgesic indicated for the relief of moderate to moderately severe pain. *Physicians' Desk Reference*, p. 835 (46th Ed.1992).

**10.** Triavil is recommended for the treatment of patients with moderate to severe anxiety and/or agitation and depressed mood, patients with depression who also exhibit severe anxiety and/or agitation, and patients with depression and anxiety in association with chronic physical disease. *Physicians' Desk Reference*, p. 1556 (46th Ed. 1992).

hand, as well as her earlier indications of bilateral diminution in grasp, an EMG/nerve conduction velocity study was to be conducted. As well, another MRI was to be conducted from C3 to T1.

The October 25, 1989, MRI suggested a correction of the previous herniated discs at C4–5 and C5–6. However, at C6–7, a small herniated nucleus pulposus [11] was detected ventrally and extended to the left of the midline. The imaging analyst concluded that, in all likelihood, the abnormality had been present on the previous examination of April 27, 1989, but was less visible at that time. Nevertheless, on November 7, 1989, Dr. Freeman reviewed the results of the MRI and EMG and concluded that the Plaintiff's nerve roots were "OK" and should be treated conservatively. In the meantime, on October 30, 1989, the Plaintiff called Dr. Fleeson to complain of continued discomfort.

On November 29, 1989, the Plaintiff called Dr. Freeman to report bilateral shoulder pain, neck pain, and the loss of strength in both arms. Dr. Freeman suggested physical therapy, but the Plaintiff was hesitant to try it again, due to her previous lack of success.

On December 20, 1989, Dr. Freeman received a call from the Benedictine Health Center, which was the Plaintiff's former employer, inquiring whether the Plaintiff was capable of returning to work in any capacity. Dr. Freeman responded that he felt it would be best for him to see the Plaintiff before responding.

On December 27, 1989, Dr. Freeman noted that the Plaintiff had suffered a 20% loss of cervical range of motion on lateral flexion and a 40% loss in her ability to extend. In view of these ongoing problems, a CT scan was scheduled in order to better document the area at C6–7, which the previous MRI had identified as a problem area.

The CT scan was conducted on December 29, 1989, and revealed no abnormalities which would significantly compress the neural structures. The disc space at C6–7 did appear to be narrowed, and the analyst detected a bilateral uncinate spondylosis,[12] but it did not appear to significantly encroach upon the adjoining neural structures.

Dr. Freeman reviewed the CT scan on January 10, 1990, and noted that it "looks good—surgical site looks great." [T. 224]. A Functional Capacities Assessment ("FCA") was suggested as a precondition to the Plaintiff's return to work at the Benedictine Health Center.

On February 26, 1990, Dr. Freeman concluded that the Plaintiff had reached Maximum Medical Improvement ("MMI"), and he provided her with a work release, as of that date, with limitations as determined by her FCA of February 8, 1990. The FCA indicated that the Plaintiff could work a 7 to 8 hour day, with sitting up to 45 minutes at a time for up to 4 hours, and standing up to 30 minutes at a time for up to 3 to 4 hours. She could occasionally walk long distances up to 4 or 5 hours of the day, but could only minimally bend, stoop, crawl or crouch. In addition, the Plaintiff was given pushing, pulling and carrying restrictions as follows:

> She can occasionally push 13½ lbs. and pull 9 lbs. She can frequently pull 6½ lbs. She can occasionally carry, as if she were carrying a bucket or luggage, 5½ lbs. in the right hand and 7.5 lbs. in the left. On a frequent basis she can carry 4 lbs. in the right hand and 6.5 lbs. in the left. Occasionally she can lift 10½ lbs. above her shoulders, 13.5 lbs. from desk to chair and 12½ lbs. from chair to floor. On a frequent basis she can lift 9 lbs. from desk to chair and 10½ lbs. from chair to floor.

[T. 228].

Following her work release, the Plaintiff was placed in a sedentary job that involved sitting and static posturing of the head and neck. Nevertheless, on March 2, 1990, she reported to Dr. Freeman that this sedentary work was beginning to aggravate her neck musculature. As she was having difficulty in handing the occupational activity, Dr. Free-

---

11. The nucleus pulposus is a semifluid mass of fine white and elastic fibers that forms the central portion of an intervertebral disc. *Physicians' Desk Reference*, p. 1158 (46th Ed.1992).

12. Spondylosis is a general term for degenerative changes due to osteoarthritis. *Physicians' Desk Reference*, p. 1567 (46th Ed.1992).

man concluded that it would be best for her to work half-days. He prescribed Elavil [13] to assist in combating her feelings of depression that were resulting from her condition.

On April 11, 1990, the Plaintiff reported ongoing problems with her work activity and the static head posturing involved. She expressed frustration and depression about her inability to contribute in any meaningful way at her job. Triavil samples were provided to help relieve her symptoms of chronic pain. It was around this time that the Plaintiff discontinued her work attempt at the Benedictine Health Center.

On April 17, 1990, Dr. Freeman prescribed a one-month trial with a TENS unit. [14] On May 9, 1990, this prescription was extended for another month, and the Plaintiff was scheduled for a work hardening program.

On June 5, 1990, the Plaintiff received emergency room treatment for complaints of low back pain which had gradually worsened over the prior two weeks. She complained of constant sharp pains throughout her lower back, which would shoot into her lower legs. After being given Darvocet [15] for her pain, she was discharged that same day, with instructions to rest in bed with ice and heat treatment. Voltarin [16] and Triavil were also prescribed.

On June 6, 1990, Dr. Freeman made note of the Plaintiff's emergency room visit, and also recorded discussions which indicated that the work hardening program was not going well. Dr. Freeman discussed the case with Dr. Barry Johnson, a neurologist, who agreed to see the Plaintiff.

On July 11, 1990, Dr. Johnson examined the Plaintiff. She related her unsuccessful attempts to try to work, and reported that she could not complete the work hardening program. She had developed increasing low back pain in the preceding month, and the TENS unit and electrical stimulation treatments had not been helpful. She was taking Tylenol and Advil for her pain, but the use of Elavil had not been helpful. Many of her other medications had been "not worth the effort." She reported her most comfortable position was flat on her back on the floor with a heating pad, and that she could not tolerate long periods of sitting, standing or walking. Dr. Johnson's conclusions were cervical and lumbar paraspinous muscle tenderness with strain pain syndrome and post-traumatic pain syndrome. She was started on Clinoril. [17] She was advised that, while her symptomatology could be cared for, she would never be expected to return to her normal self.

On August 14, 1990, the Plaintiff called Dr. Johnson to inquire about returning to physical therapy, since she felt as if there had been improvement in her condition. Return to therapy was arranged.

On August 24, 1990, the Plaintiff reported increased neck pain and spasm. Examination showed right cervical musculature, and increased cervical pain with left arm symptomatology. Another CT scan was arranged, which showed little change from the previous CT scan of December 29, 1989.

The Plaintiff again required emergency room treatment, for a sudden onset of neck pain, on September 5, 1990. The pain was experienced when the Plaintiff had bent over to take something out of her dryer. She was diagnosed with an acute cervical strain and

---

13. Elavil is an antidepressant with sedative effects. It is taken for the relief of the symptoms of depression. *Physicians' Desk Reference*, p. 2269 (46th Ed.1992).

14. A TENS (transdermal electrical neural sensory) Unit is an electrical device that is attached to the skin to stimulate nerves for the relief of pain.

15. Darvocet is indicated for the relief of mild to moderate pain, either when the pain is present alone or when it is accompanied by fever. *Physicians' Desk Reference*, p. 1255 (46th Ed.1992).

16. Voltarin is indicated for acute and chronic treatment of the signs and symptoms of rheumatoid arthritis, osteoarthritis and ankylosing spondylitis. *Physicians' Desk Reference*, p. 1043 (46th Ed.1992).

17. Clinoril is a nonsteroidal anti-inflammatory drug, also possessing analgesic and antipyretic activities. It is indicated for acute or long-term use in the relief of the signs and symptoms of osteoarthritis, and an acute painful shoulder, among other conditions. *Physicians' Desk Reference*, p. 1433 (46th Ed.1992).

was given a soft collar to wear. Tylenol No. 3 [18] and Valium [19] were prescribed.

On September 12, 1990, Dr. Johnson recorded the Plaintiff's complaints of increased head pain as well as pain that radiated into the Plaintiff's shoulders. Further therapy was recommended. Elavil was prescribed, even though it had been less than helpful in the past, since the Plaintiff had been hesitant to take Valium, which would have had a more sedating effect. She also began a course of Dolobid.[20] In addition, the Plaintiff was referred to a psychologist for help in coping with her difficulties, and she began seeing psychotherapist Sue Bruns.

At her September 28, 1990 follow-up examination with Dr. Johnson, the Plaintiff reported that her bladder infection, which persisted throughout the summer, had abated. She stated that she wanted to go back to being a C.N.A., but that she knew this was no longer appropriate for her. Dr. Johnson attempted to convince her to try working 4 hours a day, and to avoid repetitive motions and the pushing of wheelchairs. Dr. Johnson was "uncertain" as to whether the Plaintiff would be able to improve so as to be more functional.

In a telephone call to Dr. Johnson on October 16, 1990, the Plaintiff reported having difficulties with her home and physical therapy programs when she worked more than 4 hours. As a consequence, therapy was only to be continued while at home.

The Plaintiff revisited the St. Luke's emergency room with acute low back pain on October 25, 1990. The pain had worsened to such a degree that she was no longer able to walk. She appeared uncomfortable, eyes tearing, and was most comfortable when lying down. She was hospitalized and given a repeat lumbar MRI, which revealed no neural compromise. There were mild to moderate facet joint arthritic changes present throughout the small bilateral facet joint effusions at L3–4, but no significant changes from her previous MRI of May 8, 1989.

At a November 5, 1990, follow-up evaluation with Dr. Johnson, the Plaintiff reported continued soreness, despite her use of Flexeril and Motrin. Dr. Johnson observed lumbar paraspinous muscle tenderness and, after a review of the most recent MRI, he concluded that her acute low back pain was of unknown etiology, although there appeared to be some evidence of facet disease with facet effusions. Dr. Johnson concluded that the Plaintiff might be a candidate for a facet joint injection, and referred the Plaintiff to Dr. Freeman.

On November 8, 1990, Dr. Freeman found no contraindications and made arrangements for a bilateral L3–4 facet block. The record does not indicate whether this procedure was accomplished.

On November 28, 1990, her personal physician, Dr. Hieb, recorded his conversation with the Plaintiff's psychotherapist, Ms. Bruns, who advised that the Plaintiff's depression was significant and might require antidepressants. Dr. Hieb agreed to try the Plaintiff on a trial of Prozac [21] daily, in order to allow her to concentrate better and to remove some of her sense of hopelessness. The Plaintiff started the trial of Prozac immediately thereafter. However, when she reported back to Dr. Hieb on December 19, 1990, the overall sense of depression had not improved. She discontinued the Prozac on December 28, 1990, when she did not have a repeat refill. Dr. Hieb, noting a "clear cut difference between the Prozac being used at 40 mg. a day and the absence of a dose at

---

18. Tylenol No. 3 contains codeine and is indicated for the relief of mild to moderately severe pain. *Physicians' Desk Reference*, p. 1381 (46th Ed.1992).

19. Valium is indicated for the management of anxiety disorders, and is a useful adjunct for the relief of a skeletal muscle spasm that results from inflammation or trauma. *Physicians' Desk Reference*, p. 1939 (46th Ed.1992).

20. Dolobid is a peripherally acting, non-narcotic analgesic and anti-inflammatory drug. It is indi-

cated for treatment of mild to moderate pain. *Physicians' Desk Reference*, p. 1466 (46th Ed. 1992).

21. Prozac is a commonly prescribed antidepressant. It has been used with success in depressed patients whose diagnoses have corresponded most closely to the DSM–III category of major depressive disorder. *Physicians' Desk Reference*, p. 921 (46th Ed.1992).

present," reinstituted Prozac on January 8, 1991. [T. 250].

On November 30, 1990, the Plaintiff received word that her initial application for DIB had been denied. Her treating physicians at that time, Dr. Freeman and Dr. Johnson, recorded their interpretations of the Plaintiff's condition. On December 12, 1990, Dr. Freeman summarized his treatment of the Plaintiff and his analysis of her condition as follows:

> A functional capacities assessment obtained on February 8, 1990, indicated that she could only work a seven to eight hour day. * * * She has subsequently tried to return to an occupational setting and is engaged in numerous physical therapy modalities to assist her. To date she has not been able to function in an occupational setting for any length of time. To all intensive [sic] purposes she [is] 100% functionally disabled and unemployable. She has difficulty in coping with her chronic pain.

[T. 238].

On January 8, 1991, Dr. Johnson concluded as follows:

> At this time I believe that the patient is in fairly severe condition as far as ability to move and work on a regular basis. I would strongly support Dr. Freeman's letter. I do not believe that this patient will be able to return to active employment. I believe that she will continue to have some difficulties coping with the severe unrelenting chronic pain. She may benefit from trying to keep the muscle usage she has in terms of everyday living. I believe that a swim program should be attempted for 3 months, 3 times/week. I realize that this may be very difficult for the patient, but necessary so she does not lose any more muscle bulk. Preservation of function may be extremely difficult.

[T. 239].

On January 21, 1991, Ms. Bruns summarized the Plaintiff's battle with chronic physical pain and the uncertainties of employment and finances. According to Ms. Bruns, the sooner a conclusion was reached regarding the Plaintiff's disability issues, the better her recovery would be from her depression.

By January 31, 1991,[22] Dr. Hieb observed that the Plaintiff's quandaries with depression and insomnia had improved. In fact, the Plaintiff had planned on starting a swimming program and was quite excited about it. The prior incidences of frequent crying and malaise were no longer apparent.

On March 19, 1991, the Plaintiff reported to Dr. Hieb that she had experienced a spontaneous development of excruciating pain in her neck while walking the day before, and that she had suffered a marked loss of motion. At the time of her examination, the Plaintiff showed 0–2 flexion, no extension, and no rotation. Her neck was held in an absolutely rigid fashion. Dr. Hieb concluded that her injury "certainly [did,] from a clinical standpoint, involve nerve root irritation." [T. 268]. After 24 hours, the Plaintiff was reexamined, and was found to have improved movement. She then demonstrated 0–5 flexion, 0–5 extension, 0–10 right rotation, and 0–20 left rotation. She was again prescribed a soft collar.

On March 26, 1991, Dr. Hieb referred the Plaintiff to Dr. Himango, who, upon examining the Plaintiff, considered the degree of effort which she put into her flexion and extension maneuvers as "somewhat questionable." [T. 270].

On April 25, 1991, Dr. Hieb reported that the Plaintiff's depression was improved and that she was no longer in need of Prozac. At that time, the Plaintiff was described as bright and conversant. She was able to get herself up, do light house chores, and walk without difficulty.

On May 16, 1991, Dr. Keith Hartman, a psychiatrist, evaluated the Plaintiff at the request of the attorney for her employer's workers' compensation insurer, who was then

---

**22.** As mentioned, the Plaintiff's insured status for DIB benefits expired on December 30, 1990. The Plaintiff's medical condition subsequent to that date is considered insofar as that condition pertains to the severity of the Plaintiff's impairment prior to December 30, 1990. See, *Wilson v. Sullivan*, 886 F.2d 172 (8th Cir.1989); *Mitchell v. Bowen*, 827 F.2d 387 (8th Cir.1987); *Basinger v. Heckler*, 725 F.2d 1166 (8th Cir.1984).

considering her work-injury claim. Dr. Hartman reported that the Plaintiff's depressive episode in late 1990, resulted in signs of an "increase in physical symptomatology which may have then interfered with her ability to return to work". [T. 291].

During the course of the Administrative Hearing, the Plaintiff described the accident, in 1989, which resulted in the onset of her claimed disability. She and a co-worker were lifting a patient from her bed to her chair, when she "felt like a snap, like a pop in my neck * * * [a]nd it went straight down my back." [T. 42]. The Plaintiff further testified that, after the accident, she was immediately put in a neck brace, and began physical therapy, which had no effect.

The Plaintiff described her first work attempt in February of 1990, as that of a light-duty nursing assistant. In that position, she clipped the patients' nails, fixed their hair, passed ice water, made beds, and answered the telephones. She attempted to feed the patients, but the stretching and sitting that was required by such activities proved to be too difficult, and that type of work assignment was discontinued.

The Plaintiff described her work hardening program, which she undertook in May and June of 1990, as basically self-directed, and as consisting of stretching exercises, and arm and leg lifting maneuvers. She could not complete the program due to her constant pain.

She related that her second work attempt, in early October of 1990, was in a word-clerk position, that consisted of secretarial duties for 4 hours a day. In this position, she did a lot of charting, answering telephones, and functioning as a receptionist. She did some delivery runs to the hospital lab, worked with copying machines, and stocked some shelves. This work attempt lasted barely a month due to severe lower back and neck pain that was produced by having to hold her head up. The Plaintiff believed that the sitting was the primary aggravating factor, and she often became physically ill after having to sit so long. As had been the case in the prior work attempt, her doctor removed her from that work assignment.

The Plaintiff also testified that her daily activities included a fifteen-minute walk a day. She was told by her doctor that she should not exceed the fifteen minutes. She also worked with an exercise bicycle. She was able to do laundry with her husband's assistance in the lifting aspects of the job. She would lifts nothing heavier than 5 to 7 pounds, which was consistent with her doctors' instructions. She tried to clean a couple of rooms each day, but then she needed to lay down and nap for an hour or so at 11:30 a.m. or 12:00 p.m. In response to a question from her attorney, the Plaintiff testified that, in 1987—prior to the alleged onset of disability—she could have cleaned her entire home in the time that was now required to clean two rooms.

The Plaintiff cooked dinner, with assistance from her husband, while her husband bathed her children, since she could no longer bend into the bath tub. She usually retired at about 8:00 or 8:30 p.m.

The Plaintiff testified she occasionally tried to hook rugs, but that she could not sit and perform that work for very long. When she had the opportunity, she would go to the beach, and she found the swimming to be a great relief. She could no longer play baseball with her group of friends or go skiing, and she particularly missed skiing. She also testified to some difficulties she was experiencing in book reading, as a result of having to keep her head steady for too long of a period of time. She could no longer shovel snow, rake leaves, or perform other yard work. Once in a while, she would try to clean windows, but she found that two was about all she could complete.

The Plaintiff testified that she "tried her hand" at camping the week prior to the Hearing, but that it "did not work out well." [T. 67]. She also testified that she currently took Tylenol and Advil for her pain, and did not experience any adverse side effects. She did acknowledge, however, that she had been on more potent medication in the past, including Elavil, Triavil and Flexaril. She testified that, although those medications had been more helpful in controlling her pain, she had to take care of her children and did not want to be tired or in a deep sleep, because

of the drugs, when she was responsible for their safety and well being.

In response to a question from the ALJ, the Plaintiff admitted that she was not currently suffering from depression.

The ALJ then commented on the FCA of February 8, 1990, and asked the Plaintiff if this was a fair assessment of her functional capacities. The Plaintiff responded that she probably could sit for 45 minutes at a time, "probably comfortably at times," but "not on an everyday basis." [T. 66].

Mr. Jack Casper, a VE, testified at the Hearing, after reviewing the exhibits and auditing the previous testimony. He characterized the Plaintiff's job as a C.N.A. as at the medium exertional level, and as being semi-skilled. However, the job is often performed at a heavy level due to the lifting of patients. The Plaintiff's counter clerk and office clerk positions were semi-skilled, light duty positions.

The VE also expressed his view that the Plaintiff had some transferable skills, particularly in terms of meeting her ability to meet the public and to manage files and records. Such skills, the VE concluded, would transfer to an information clerk or receptionist type of position.

In his first hypothetical to the VE, the VE was asked to assume the limitations that had been described by the Plaintiff and, if her testimony was accepted as true, would the Plaintiff be able to perform her past relevant work as she had previously performed it. The VE responded that she would not have that capability. The VE also concluded that, on the basis of the same hypothetical, there would be no other work that the Plaintiff could perform on a sustained, competitive basis.

In his second hypothetical, the ALJ asked the VE to assume that the Plaintiff could sit for 45 minutes at a time for up to 8 hours, and that she had the other functional capacities recited in the FCA of February 8, 1990. The VE was also asked to assume that the Plaintiff had her "depression under control and [her] pain controlled by medication." [T. 72]. The VE testified that such a person could not perform the Plaintiff's past rele-

vant work, but could perform other work in the national economy, including that of a receptionist, information clerk, certain cashier positions, and bench work occupations.

## IV. *The ALJ's Findings*

Based upon this Administrative Record, the ALJ found that the Plaintiff was, at all relevant times, a "younger individual" (i.e., less than 50 years of age), with a high school education, who had not engaged in substantial gainful activity since April 25, 1989, which was her alleged onset date, and that she had met the disability insurance status requirements from April 25, 1989 to December 31, 1990. In addition, the ALJ found as follows:

\* \* \* \* \* \*

3. The medical evidence establishes that the claimant suffers from history of scoliosis with Harrington rod implantation; acute cervical disc herniation at C4–5 and C5–6 with right C5 radiculopathy, status post cervical discectomy, decompression and fusion; as well as low back pain, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's statements and testimony as to the level, severity and frequency of her pain and degree of functional limitations is not accepted for reasons discussed in this decision.

5. The claimant has the residual functional capacity to perform the requirements of work except for sitting more than 45 minutes and up to four hours in an eight-hour day; occasionally walking long distances up to four or five hours a day; more than minimally bending, stooping, crawling, or crouching; more than occasionally squatting, climbing stairs, kneeling and balancing; occasionally pushing 13.5 pounds; frequently pulling 6.5 pounds and occasionally pulling 9 pounds; occasionally carrying 5.5 pounds in the right hand and 7.5 in the left; occasionally carrying 6.5 pounds in the right or left hand; occasionally lifting 10.5 pounds above the shoulders, 13.5 pounds from desk to chair, and 12.5 pounds from chair to floor; and frequently

lifting 9 pounds from desk to chair and 10.5 from chair to floor. (20 C.F.R. § 404.-1545).

6. The claimant is unable to perform her past relevant work as nurse's aide, counter clerk, or office clerk.

\* \* \* \* \* \*

9. Although the claimant's limitations do not allow her to perform the full range of work at any exertional level, there are a significant number of jobs she can perform, including receptionist/information clerk (3,000 to 4,000); cashier (5,000) and bench worker (5,000).

10. The claimant was not under a "disability", as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 404.1520(f)).

On this Administrative Record, the Plaintiff seeks a reversal of the ALJ's decision and argues that the decision is unsupported by substantial evidence on the record as a whole. In the alternative, the Plaintiff seeks a remand to the Secretary in order to permit a reappraisal of the totality of the evidence. In turn, the Secretary argues that the ALJ's decision is in accord with the governing law, and is supported by substantial evidence.

### V. *Discussion*

 A. *Standard of Review.* The Secretary's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the record as a whole. *Title 42 U.S.C. § 405(g)*; see, e.g., *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir.1992); *Groeper v. Sullivan*, 932 F.2d 1234, 1237 (8th Cir.1991); *Burns v. Sullivan*, 888 F.2d 1218, 1219 (8th Cir.1989); *Zenker v. Bowen*, 872 F.2d 268, 270 (8th Cir.1989). In other words, the decision must be affirmed if it is supported by evidence which a reasonable mind might accept as adequate to support the Secretary's conclusion. *Whitehouse v. Sullivan*, 949 F.2d 1005, 1006 (8th Cir.1991). This standard of review is more than a mere search for the existence of evidence supporting the Secretary's decision. *Brock v. Secretary of Health and Human Services*, 791 F.2d 112, 114 (8th Cir.1986). The substantiality of the evidence must also take into account whatever fairly detracts from its

weight. See, *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir.1991); *Easter v. Bowen*, 867 F.2d 1128 (8th Cir.1989); *Osborn v. Bowen*, 794 F.2d 385 (8th Cir.1986). The notable distinction between "substantial evidence" and "substantial evidence on the record as a whole" must be recognized. See, *Jackson v. Hartford Accident and Indemnity Co.*, 422 F.2d 1272, 1277 (8th Cir.1970) (Lay, J., concurring), cert. denied, 400 U.S. 855, 91 S.Ct. 86, 27 L.Ed.2d 92 (1970). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether or not substantial evidence in the record as a whole supports the findings of fact upon which a Plaintiff's claim was granted or denied. Cf., *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir.1989); *Bland v. Bowen*, 861 F.2d 533 (8th Cir.1988); *Clarke v. Bowen*, 843 F.2d 271, 272 (8th Cir.1988); *Turpin v. Bowen*, 813 F.2d 165 (8th Cir.1987); *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987).

▪ Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *McMillian v. Schweiker*, 697 F.2d 215, 220 (8th Cir.1983). Therefore, if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, we must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992). Under this standard, we do not reverse the Secretary even if this Court, sitting as the finder-of-fact, would have reached a contrary result. *Jernigan v. Sullivan*, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions and, thus, it embodies a "zone of choice" within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal. *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir.1991); *Steele v. Sullivan*, 911 F.2d 115, 116 (8th Cir.1990). Our review of the ALJ's factual determinations, therefore, is deferential. *Bland v. Bowen, supra.*

B. *Legal Analysis.* As he was required to do, the ALJ applied the sequential, five-

step analysis prescribed by 20 C.F.R. §§ 404.1520.[23] At the Fourth Step in the analytical process, the ALJ determined that the Plaintiff was not able to perform her past relevant work and, thereupon, the burden of proof shifted to the Secretary to establish that jobs existed in the national economy which the Plaintiff could perform. It is at the Fifth Step in the analysis that the Plaintiff has focused her challenge and has sought a reversal. In support of her Motion for Summary Judgment, the Plaintiff claims that:

1. The ALJ erroneously discounted evidence of nonexertional impairments; and,

2. The vocational evidence of employability was based upon an incomplete hypothetical and must be disregarded.

Although we will address each of these contentions in sequence, a brief prefatory comment may assist in placing the remainder of our analysis in context.

Ever so reluctantly, we are compelled by the record before us to observe that, reminiscent of the stepsisters of Cinderella, the ALJ has pinched and strained to force a result that plainly does not fit. Screening the record, much like gravel is classified, the ALJ suggests a uniformity in the evidence that would, if substantiated, necessarily disqualify the Plaintiff from benefits. We find, however, that the perceived consistencies, which the ALJ has exhorted as determinative, are as much artifice as they are fancy. In large measure, the ALJ has either overlooked or has unsoundly · discredited that evidence which flatly disproves the result he has chosen to reach. Given Congress' express intent to reserve such matters to the Secretary, we recognize, and we accept, our inaptitude to reweigh the evidence or to draw inferences from that evidence. These constraints upon our factfinding capabilities, however, are largely inconsequential where, as here, the administrative decisionmaking is so starkly at odds with the Administrative Record as to be self-invalidating. As best as we are able to discern, the fabric of disciplined analysis, that has been so carefully formulated by the enactments of Congress and by the regulations of the Secretary, was here abandoned in the haste toward decisionmaking.

Since the ALJ's decision is driven by his credibility determinations, it is there that our · analysis begins.

1. *The ALJ's Credibility Determinations with Regard to the Plaintiff's Allegations of Pain.*

 ▪ a. *Standard of Review.* Under the law of this Circuit, credibility determinations are initially within the province of the ALJ. *Underwood v. Bowen,* 807 F.2d 141, 143 (8th Cir.1986); *Driggins v. Bowen,* 791 F.2d 121, 125 n. 2 (8th Cir.1986). Notwithstanding this initial responsibility, the mode and method by which a credibility finding must be supported, particularly when subjective complaints are involved, is dictated by the holdings in *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir.1984) [24] and its progeny. See, e.g., *Rainey v. Bowen,* 814 F.2d 1279, 1281 (8th Cir.1987); *Florer v. Heckler,* 777 F.2d 1321 (8th Cir.1985); *Lanning v. Heckler,* 777

---

**23.** The five-step sequential analysis of 20 C.F.R. § 404.1520 has been paraphrased as follows:

(1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen,* 898 F.2d 1361, 1363–64 n. 3 (8th Cir.1990), (paraphrasing *Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 2290–92, 96 L.Ed.2d 119 (1987)).

**24.** Supplemented, 751 F.2d 943 (8th Cir.1984), vacated, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974 adhered to on remand, 804 F.2d 456 (8th Cir.1986), cert. denied, 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987).

F.2d 1316 (8th Cir.1985). As a result, a credibility determination must devolve from a resolution of conflicts in the relevant evidence in the record. Cf., *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989); *Rainey v. Bowen,* supra. As a finding of fact, the credibility determination must be supported by substantial evidence in the record as a whole. See, *Rautio v. Bowen,* 862 F.2d 176 (8th Cir.1988); *Jeffery v. Secretary of Health and Human Services,* 849 F.2d 1129 (8th Cir.1988); *Dawson v. Bowen,* 815 F.2d 1222, 1225 (8th Cir.1987).

■ To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the record which have led to the rejection of the Plaintiff's testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting the pertinent testimony. See, *Ricketts v. Secretary of Health and Human Services,* 902 F.2d 661 (8th Cir.1990); *Rautio v. Bowen,* supra; *Butler v. Secretary of Health and Human Services,* 850 F.2d 425 (8th Cir.1988). These requirements are not suggestive guidelines, but are mandates which impose affirmative duties upon the deliberative processes of the ALJs. See, *Cline v. Sullivan,* supra; *Johnson v. Secretary of Health and Human Services,* 872 F.2d 810, 814 n. 3 (8th Cir.1989).

■ In making a credibility determination where, as here, the Plaintiff's complaints of pain are at issue, an ALJ must consider and evaluate the Plaintiff's prior work record and the observations of third parties and physicians concerning:

1. the claimant's daily activities;

2. the duration, frequency and intensity of the pain;

3. the precipitating and aggravating factors of the pain;

4. the dosage, effectiveness, and side effects of medication; and

5. the claimant's functional restrictions.

*Jeffery v. Secretary of Health and Human Services,* supra; *Dawson v. Bowen,* supra at 1225–26; *Polaski v. Heckler,* supra at 1321, 1322.

■ It is well-established that an ALJ may not disregard a claimant's subjective complaints of pain solely because there is no objective medical evidence to support them. *Cockerham v. Sullivan,* 895 F.2d 492 (8th Cir.1990); *O'Leary v. Schweiker,* 710 F.2d 1334 (8th Cir.1983).

■ It is equally well-established that the physiological, functional and psychological consequences of illness and injury may vary from individual to individual. *Simonson v. Schweiker,* 699 F.2d 426 (8th Cir.1983). "A back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." *O'Leary v. Schweiker,* supra at 1342. *Landess v. Weinberger,* 490 F.2d 1187 (8th Cir.1974). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the record as a whole. *Harris v. Secretary of the Department of Health and Human Services,* 959 F.2d 723, 725 (8th Cir.1992), citing, *Polaski v. Heckler,* supra; *Prince v. Bowen,* 894 F.2d 283, 286 (8th Cir.1990); *Herbert v. Heckler,* 783 F.2d 128, 130 (8th Cir.1986); *Lanning v. Heckler,* supra at 1317. Upon disbelieving any relevant testimony, the ALJ is obligated to make an express credibility determination that satisfactorily explains the reasons for discrediting those complaints. *Ghant v. Bowen,* 930 F.2d 633 (8th Cir.1991).

b. *Legal Analysis.* In determining that the Plaintiff was not entitled to DIB, the ALJ found, in part, as follows:

> The claimant's statements and testimony as to the level, severity and frequency of her pain and degree of functional limitations is not accepted for reasons discussed in this decision.

[T. 19].

For want of a more cogent basis, the ALJ cites the following considerations as supportive of his determination that the Plaintiff has not truthfully recounted her pain and her subjective complaints:

1) The Plaintiff has been engaged in a Workers' Compensation claim that involves the same injury at issue here, and that, accordingly, "the degree and severity of [her] pain is to a large extent related to her ongoing claims for disability as a worker and for Social Security purposes, and is found to be exaggerated."

2) On one occasion, the Plaintiff is reported to have characterized her pain as a "nuisance."

3) The Plaintiff's daily activities of light housework and cooking, which were reported on one occasion as having been carried out without difficulty, are inconsistent with her claimed disability.

4) The Plaintiff's "need for or use of pain-relief medications" is "[g]laringly lacking."

5) The opinions of the Plaintiff's treating physicians are unbefitting of reliance.

In our view, under any detached, objective appraisal of the Administrative Record *as a whole,* these considerations are picayune, at best. Nevertheless, we feel obligated to address their respective merits.

### 1) *The Plaintiff's Workers' Compensation and Social Security Claims.*

In minimizing the Plaintiff's subjective complaints as some form of hysteroid reaction, that was precipitated by her administrative claims for Workers' Compensation and Social Security benefits, the ALJ relies upon a psychiatric evaluation that had been conducted by Dr. Keith E. Hartman.[25] In this respect, the ALJ purports to paraphrase the substance of Dr. Hartman's opinion as follows:

**25.** We observe obvious limitations in the opinions expressed by Dr. Hartman, which were entirely overlooked by the ALJ. First, given its retrospective content, we are not particularly concerned that Dr. Hartman's examination of the Plaintiff occurred after the expiration of her insured status, but we may not be oblivious to the fact that Dr. Hartman's examination was consultative, was secured by a party whose interests were adverse to the Plaintiff's, and was premised solely upon a 2½ hour interview. While these factors do not, necessarily, disqualify the opinions expressed by Dr. Hartman, in view of the substantial reliance that the ALJ placed upon his construction of those opinions, some indication as to their probative suitability would have been

In his report of record, Dr. Hartman felt claimant's ongoing pain was directly related to her legal action which represents an additional psychological load with predictable negative ramifications to her recovery since it promotes a focus on what has happened and a focus on disability * * *. Thus, while the claimant does suffer from pain and discomfort, the degree and severity of that pain is to a large extent related to her ongoing claims for disability as a worker and for Social Security purposes, and is found to be exaggerated.

[T. 17].

The paraphrase is not merely unfair, it is plainly inaccurate. What Dr. Hartman had to say on the subject, without paraphrase, was as follows:

[The Plaintiff] needs to be rid of the stress of this legal action. It represents an additional psychological load with predictable negative ramifications to her recovery. It promotes a focus on what has happened, a focus on disability—when the helpful emphasis would be on the future, and on her capabilities.

[T. 292].

As is obvious, the observation of Dr. Hartman had no apparent relationship to the Plaintiff's perception of pain; his concern was with the Plaintiff's prior bout with depression which had been successfully treated, but could reoccur.[26] As to any relationship between her legal actions and her pain, Dr. Hartman's opinion squarely contradicts that foisted into the process by the ALJ. As expressed by Dr. Hartman:

enlightening. Cf., *Piercy v. Bowen,* 835 F.2d 190 (8th Cir.1987); *Brock v. Secretary of Health and Human Services,* 791 F.2d 112 (8th Cir.1986) (per curiam); *Millbrook v. Heckler,* 780 F.2d 1371 (8th Cir.1985); *Van Horn v. Heckler,* 717 F.2d 1196 (8th Cir.1983); *Nelson v. Heckler,* 712 F.2d 346 (8th Cir.1983).

**26.** In this respect, Dr. Hartman's opinion is entirely consistent with the views of the Plaintiff's treating psychotherapist and with common sense. [T. 253]. The uncertainties that the Plaintiff has encountered in the course of these proceedings alone, would not be counterindicative of frustration or episodic depression. *Id.*

To the best of medical certainty, Ms. Garthus suffered a depressive episode in 1990 as a result of her spinal injury of April 24, 1989. This resulted not only in psychological discomfort but also an increase in physical symptomatology which may have then interfered with her ability to return to work. At the present time, she shows little or none of these signs of depression.

\* \* \* \* \* \*

I believe we could say in the case of Amy Garthus she does have a good deal to learn about pain management. I do not believe here physical discomfort is likely to disappear because of increased conditioning or mental readjustment. Her past experience can provide a reasonable guide to treatment efforts in the future. She did well with one-to-one therapy but poorly with a formal "pain program." Family doctors and anti-depressants were helpful, psychologists and QRC's much less so. I see here as demonstrating a significant drive for vocational achievement. I cannot tell whether she will be able to enter competitive employment in the future but am certain for many years she will be striving to enlarge the boundaries of her physical capabilities.

[T. 291–92].

Notably, when his opinion is properly reviewed as assessing the Plaintiff's complaints of pain, Dr. Hartman does not believe that her physical discomforture will be diminished either by conditioning or by mental readjustment. Indeed, given Dr. Hartman's appraisal that the Plaintiff is highly motivated to work, we regard the ALJ's suggestions to the contrary as mere imaginings. Our conclusion in this respect is fortified by the absence of any evidence in the record to suggest that the Plaintiff's pain is hysterical in origin.

Nor do we accredit the ALJ's surmise that the Plaintiff may be the recipient of a Workers' Compensation windfall. Despite the ALJ's obvious concern that the Plaintiff may be receiving more in compensation from her industrial injury than she had previously earned in wages during any calendar year, the mere illusion of a windfall is a particularly tenuous basis upon which to hang a denial of DIB. As between the suppositions of the ALJ and the obligations of the Minnesota Department of Labor and Industry to assure the fair application of the State's Workers' Compensation laws, we find little in this record to question either the amount or the Plaintiff's entitlement to the benefits she has received.[27]

2) *The Plaintiff's Description of Her Pain, on One Occasion, as a "Nuisance."*

As if to underscore his presumption that the Plaintiff was exaggerating her complaints of pain, the ALJ has isolated a single occasion on which she described her pain, to Dr. Hartman, as a "nuisance."[28] We feel it instructive to place that descriptive term back into its contextual setting.

As reported by Dr. Hartman, the Plaintiff's comments were as follows:

Some variety of painful sensation is present constantly. On the other hand, exacerbations lead to problems so great that she has to lie flat on her back for hours at a time, and these difficulties may come once or twice a day. Just to sit leaves her neck quite sore and may result in twisting cramps in her lower back. Low back pain will occasionally lead to numbness or even aching pain in her left lateral thigh. Ice

---

27. We do not dispute the relevancy of the Plaintiff's Workers' Compensation benefits as an offset to any Social Security benefits to which she may be entitled. *Title 42 U.S.C. § 424a; 20 C.F.R. § 404.408; Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Lofty v. Richardson,* 440 F.2d 1144 (6th Cir.1971), cert. denied, 404 U.S. 985, 92 S.Ct. 443, 30 L.Ed.2d 369 (1971). However, this is not the issue that the ALJ has addressed.

28. For our purposes, we may accept the ALJ's connotation of "nuisance" as implying a pesky, yet negligible inconvenience, although we do not agree that its impact need be minuscule. According to *The American Heritage Dictionary of the English Language,* p. 1241 (3rd Ed.1992), "nuisance" is defined as follows:

One that is inconvenient, annoying, or vexatious; a bother \* \* \*.

As we understand the term, albeit in its colloquial sense, the connotation of a "pain in the neck" is frequently intended. See, Rodale, J.I., *The Synonym Finder* p. 791 (Warner Books, 1978).

and heat will help, particularly if she is lying down. "It's a nuisance, something I have to learn to live with."

[T. 286].

We do not understand the ALJ's apparent interest in trivializing the Plaintiff's oft-repeated complaints of disabling pain. Were there to have been a genuine effort on the part of the ALJ to review the record impartially, then one would have expected the ALJ to refer to those characterizations of the Plaintiff's complaints which were inconsistent with his adoption of a single portrayal of the pain as a "nuisance."

Without attempting to be exhaustive, we note the following references, which are clearly in conflict with the ALJ's notion that the Plaintiff's pain was of a trifling sort: "severe burning" (April 25, 1989, Dr. Fleeson); "constant throbbing pain" (May 10, 1989, Dr. Fleeson); "constant aching" (June 2, 1989, Dr. Fleeson); "severe neck discomfort" (July 13, 1989, Dr. Fleeson); "tearing in her neck" (October 18, 1989, Dr. Freeman); "chronic pain" (April 11, 1990, Dr. Freeman); "constant sharp pains" (June 5, 1990, Dr. Freeman). Inexplicably, the ALJ ignores these reports and descriptions of pain that the Plaintiff voiced to her treating physicians in her efforts to obtain relief. Given the highly selective process in which the ALJ has engaged in gathering his evidence, we are left with the distinct impression that he has reviewed the record, much as a child would scan a playground, looking for the face of a friend and ignoring all else.

### 3) *The Plaintiff's Pain is Belied by Her Daily Activities.*

In denying benefits, the ALJ felt that the Plaintiff's daily activities, including her use of an exercise bicycle, her walking, and her performance of light housework and cooking, disproved the disabling effect of her impairments. We commence our review of that consideration with a recognition that the ability to do housework, or to perform other minor tasks on a sporadic basis, is not equivalent to the ability to engage in substantial gainful activity. See, *Ricketts v. Secretary of Health and Human Services,* supra; *Bishop v. Sullivan,* 900 F.2d 1259 (8th Cir.1990); *Ludden v. Bowen,* 888 F.2d 1246 (8th Cir.

1989). Similarly, limited activities are not necessarily inconsistent with allegations of pain or with the presence of pain that would reasonably preclude full-time employment. See, *Ekeland v. Bowen,* 899 F.2d 719 (8th Cir.1990); *Easter v. Bowen,* supra.

Here again, we are forced to conclude that the narrow vision, with which the ALJ has surveyed this record, accounts for his woefully errant conclusion that the Plaintiff's activities are corroborative of her ability to engage in substantial gainful activity. Absent from his analysis is any recognition that the Plaintiff has consistently demonstrated an extremely limited range of motion, with almost no capability to flex or extend her neck; that it was pain and discomfort which led the Plaintiff to discontinue her work hardening program; that significant pain and nausea plagued her physical therapy sessions, which were ultimately discontinued because of a worsening of her condition on numerous separate occasions (e.g., May 16, 1989; July 13, 1989; September 29, 1989; and October 16, 1990); and that the more sedentary aspects of her two work attempts in 1990 resulted in a significant and uncontroverted aggravation of her condition to such a degree that she could not continue with her re-employment.

Similarly, the ALJ ignores the uncontradicted evidence that the consequence of such an apparently innocuous activity as walking has led the Plaintiff's doctors to limit her walks to a 15 minute period. On the one hand, the Plaintiff has been encouraged by her treating physicians to remain active in order to preserve her functional capacities while, on the other hand, her engagement in such activities have repeatedly caused her to experience such pain as necessitated further medical treatment. Upon any dispassionate review, the record in this case unquestionably demonstrates that the Plaintiff's engagement in limited daily activities is not consistent with the ability to perform work "day in and day out in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982). The Plaintiff's failed work attempts, which resulted from her incapacity to endure pain—at least insofar as they record demon-

strates—is compelling proof of her inability to react to the real world of competitive employment.

### 4) The Plaintiff's "Need for or Use of Pain–Relief Medications" Is "[G]laringly lacking."

We find particularly quizzical the ALJ's assertion that "[g]laringly absent in this case is the need for or use of pain-relief medications." [T. 18]. We find the ALJ's inference that there is no documentation of "need" for pain relief medications to be completely incomprehensible. The ALJ himself admitted that "there is no doubt that the claimant experiences pain and discomfort related to her impairments." *Id.* at 17. We find no rational explanation for the ALJ's disregard of the Plaintiff's documented use of Robaxin, Flexeril, Talacen, Triavil, Tylenol No. 3, Voltarin, Clinoril and Dolobid, all for the relief of pain. While the Plaintiff has readily admitted to discontinuing the use of these medications, either on her own or upon instruction from her treating physicians, the fact of the matter is that she either found the medications to be ineffective in abating her pain or so disruptive of her capability of parenting her children, that a continuation of the prescriptions was, to her mind, contraindicated. Unfortunately, the ALJ does not address this evidence, even inferentially. Upon our review, we find no basis to reject the Plaintiff's evidence in this respect.

### 5) The Opinions of the Plaintiff's Treating Physicians.

Two of the Plaintiff's treating physicians, Dr. Freeman and Dr. Johnson, both concluded that she was disabled because of the same impairment which, she claims, qualifies her for DIB. Notably, the opinions of these treating physicians go uncontradicted even though the Plaintiff has been examined by a fairly substantial number of health care professionals. In dismissing the significance, if not the substance of these opinions, the ALJ stated:

> While Dr. Freeman and Dr. Johnson have expressed the opinion claimant is not capable of competitive employment, those opinion [sic] are directly contrary to Dr. Freeman's February 1990 report in which he indicated the claimant would be capable of

working seven or eight hour days. Further, both Dr. Freeman's and Dr. Johnson's statements were directly following a work attempt at a job which exceeded the functional limitations outlined in his February 1990 report.

[T. 18].

Following our careful review of the record, we are not aware of any aspect of the jobs, to which the Plaintiff returned in 1990, which exceeded the functional limitations outlined in the Plaintiff's FCA. In view of the pivotal role that the governing law attaches to the opinions of a treating physician, we expect more of an ALJ, in his dismissal of such opinions, than the verbalization of an oblique reproach that is not independently verifiable. See, *Ward v. Heckler,* 786 F.2d 844, 846 (8th Cir.1986); *Vasquez v. Schweiker,* 701 F.2d 733, 736 (8th Cir.1983). While the deference accorded to the opinion of a treating physician is not without limits, the ALJ has failed to advance any shortcoming in the physicians' appraisals which warrants the wholesale rejection that the ALJ has here accomplished. *Browning v. Sullivan,* supra at 823; *Turley v. Sullivan,* 939 F.2d 524, 527 (8th Cir.1991); *Matthews v. Bowen,* 879 F.2d 422, 424 (8th Cir.1989).

We find nothing particularly discrediting in a doctor's revision of a prior opinion when the modification is dictated by a change in the circumstances upon which the first opinion was premised. Whatever may be said about the predictive value of an FCA, in all practicality, the technique is meant to replicate the real world of the workplace. Here, based upon that assessment, the Plaintiff was assigned work which was consistent with her limitations but which, nonetheless, she could not successfully perform. Based upon these circumstances, we find nothing implausible about a physician's acceptance of the results of a trial in the workplace. We do find implausible the ALJ's insistence that the FCA disproves the results of the two work attempts that the Plaintiff has endured. Indeed, given the subsequent rejection of the capacities assessment by the Plaintiff's treating physicians, who were solely instrumental in obtaining that appraisal of her functional capabilities, the ALJ alone treats that assess-

ment as a conclusive presumption against the Plaintiff's entitlement to benefits. We are at a loss to understand how the Plaintiff could overcome a presumption of physical capacity that is supported by nothing more than an ALJ's insistence.

 In sum, we find that the ALJ's credibility determinations are not supported by substantial evidence and are otherwise affected by errors of law. The mere recital of the *Polaski* decision is insufficient to salvage a factfinding process which is wholly bereft of considered reasoning or analysis. We are not confronted here with an ALJ who deliberately chose one result from a zone of reasonable, evidentiary inferences; rather, we have a denial generated by whimsy, surmise, or simple expedience. This we cannot accept.

### 2. The ALJ's Hypothetical to the Vocational Expert.

 In view of our determination that the ALJ's rejection of the Plaintiff's complaints of disabling pain were in error, we are obligated to determine what impact, if any, that error may have had on the Secretary's denial of the Plaintiff's claim. Due to the astuteness of Plaintiff's counsel, we have no doubt but that a properly framed hypothetical to the VE, which properly credited the Plaintiff's subjective complaints, would have resulted in a determination of disability, for such a hypothetical is presented in this record.

In his first hypothetical to the VE, the ALJ inquired as follows:

Q. Okay, Mr. Casper, assuming that I have a person of the claimant's age, education and work experience and assuming that this person has the limitations that have been described by the claimant, and assuming that I would find that the testimony describing such limitations was entirely credible, would this person be able to perform past work as the claimant performed it, or as performed in the national economy?

A. No, she would not.

[T. 71].

Ironically, when the VE inquired as to whether the ALJ wanted an explanation of the bases for his opinion, the ALJ responded: "No, it's not necessary." [T. 72]. Wisely, counsel for the Plaintiff did ask the VE for an explanation of his opinion in the following exchange:

Q. * * * I guess I'd like to go back to your answer to the first hypothetical posed by the Judge and follow up on your indication to what things in the claimant's testimony were important in indicating no past work or no other work that exist in the national or regional economy?

A. Yes. Well, I think there's a number of factors that we look at. First of all she states her doctor has told her that she could lift five to seven pounds safely, and she states that she observes this rule. This basically, this eliminates some of the range of sedentary work for her. She has made two work attempts on jobs that are flexible in terms of sitting and standing and walking with minimal lifting and she has not been able to sustain efforts at these jobs, sustain [sic] basis or competitive basis, and if she's unable to do this, then [sic] would lead me to believe that there are jobs with positional changes she wouldn't be able to perform on a regular basis. Also, she states that she has difficulty with concentration and holding her head in a position to pay attention to something and this would further, I think, eliminate certain jobs even within a sedentary category, and taking all these factors into account, it would be, and it would be very difficult to find, sustain [sic] employment that she could hold.

[T. 74–75].

In view of the VE's opinion that the Plaintiff would not be able to perform her past relevant work, or to perform other work in the national economy with the limitations established by the substantial evidence in this record, when the record is considered as a whole, we find a remand unnecessary, since the Secretary has failed to carry her burden of proof at Step Five, and the Plaintiff is entitled to the entry of Judgment as a matter

of law. *Fleshman v. Sullivan,* 933 F.2d 674, 676 (8th Cir.1991); *Title 42 U.S.C. § 405(g)* (authorizing reversal with or without remand).[29]

WHEREFORE, It is—

RECOMMENDED:

1. That the Plaintiff's Motion for Summary Judgment [Clerk Docket #4] be GRANTED.

2. That the Defendant's Motion for Summary Judgment [Clerk Docket #6] be DENIED.

3. That the decision of the Defendant Secretary of Health and Human Services be reversed and the matter submitted to the Defendant for the calculation and award of benefits.

### NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D.Minn. LR1.1(f), and D.Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than September 27, 1993,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than September 27, 1993,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.

**29.** When a reviewing court finds that the Secretary has failed to articulate reasons for refusing to credit a claimant's subjective complaints of pain, or if the articulated reasons are not supported by substantial evidence on the record as a whole, those complaints may be accepted as true, and the administrative decision may be reversed rather than remanded. *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir.1991); *Hale v. Bowen,*

831 F.2d 1007 (11th Cir.1987). Under this authority, we find that a reversal to be appropriate here.