256 N.W.2d 619 (1977)
STATE of Minnesota ex rel. INDEPENDENT SCHOOL DISTRICT NO. 276, Minnetonka, Appellant,
v.
DEPARTMENT OF EDUCATION of State of Minnesota, Respondent,
Warren Courtland MacFarlane, Respondent.
No. 47050.
Supreme Court of Minnesota.
July 1, 1977.
*621 Kelly & Larson, William F. Kelly and John C. Sanders, Excelsior, for appellant.
Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Donald J. Mueting, Sp. Asst. Atty. Gen., St. Paul, for Dept. of Ed.
Wright, Roe & Schmidt and Steven B. Schmidt, Minneapolis, for MacFarlane.
Peterson, Popovich, Knutson & Flynn, Peter S. Popovich and Robert A. Hughes, St. Paul, for Minn. School Boards Assoc., amicus curiae, seeking reversal.
Heard before ROGOSHESKE, PETERSON and SCOTT, JJ., and considered and decided by the court en banc.
SCOTT, Justice.
This is an appeal from an order of the district court reviewing a directive of the State Department of Education (Department). The matter arose when Warren Courtland MacFarlane (Mr. MacFarlane) filed with the Department an application to require the Minnetonka School District (Minnetonka) to defray the expenses of special instruction for his handicapped son, Warren Conley MacFarlane (Conley). By a directive dated August 13, 1975, the Department ordered Minnetonka to pay the expenses of Conley's instruction for the 1974-75 school year and to devise an educational program for him for the 1975-76 school year. Minnetonka sought review by writ of certiorari in the district court of Hennepin County.
The district court issued findings of fact, conclusions of law, and an order upholding the Department's directive with a minor exception. Minnetonka brought this appeal when its motion for amended findings was denied. We affirm, with a remand for further proceedings as ordered by the district court.
On August 26, 1974, Mr. MacFarlane filed with the Department an application on behalf of his son, Conley. His application alleged and requested the following:
(1) His son Conley, age 10, had suffered brain damage at birth resulting in learning disabilities and other neurological problems;
(2) Conley was presently enrolled in the Groves School, a private school for children with special learning disabilities;
(3) Despite three requests, Minnetonka had continued to refuse tuition assistance for Conley at the Groves School;
(4) Minnetonka was not presently able to give adequate instruction to a child with Conley's disabilities;
(5) The Department's assistance was therefore needed to require Minnetonka to fulfill its duties under Minn.St. 120.17.
*622 The statute in question, Minn.St. 120.17,[1] provides in subdivision 1:
"Every district and unorganized territory shall provide special instruction and services for handicapped children of school age who are residents of the district. School age means the ages of four years to 21 years for children who are deaf, blind, crippled or have speech defects; and five years to 21 years for mentally retarded children; and shall not extend beyond secondary school or its equivalent."
Subdivision 2 lists the various methods by which special instruction for handicapped children may be provided. L.1971, c. 689, added category (h), which provides that the school district may "contract with public, private or voluntary agencies" to deliver required services. Subdivision 4 establishes the compensation scheme sought to be used by Mr. MacFarlane:
"* * * The parent or guardian of a handicapped child who resides in a district which does not provide special instruction and services within its district may make application to the commissioner for special instruction and services for his child under one of the methods provided.
"If the commissioner finds that the local district is not providing such instruction and services, he shall arrange for the special instruction and services provided. If the instruction and services are provided outside the district of residence, transportation or board and lodging, and any tuition to be paid, shall be paid by the district of residence."
The commissioner of education delegated his authority to conduct an investigation and make findings and decisions in the matter to Will Antell, assistant commissioner for special and compensatory education, by written order dated October 25, 1974. This order was not filed with the secretary of state pursuant to Minn.St. 15.06, subd. 2,[2] and no notice of the delegation was given to the parties at the commencement of this action. It has since been filed.
By letter of March 24, 1975, Antell directed Minnetonka to contract with the Grove School for the final two months of the 1974-75 school year pursuant to Minn.St. 120.17, subd. 4, quoted above. Minnetonka immediately sought review of this directive by writ of certiorari in the district court of Hennepin County. The writ was granted on May 21, 1975, but was later dismissed by a stipulation of the parties.
During the spring and early summer of 1975, Antell conducted an investigation of the special education program in the Minnetonka School District. Two staff members of the Department spent several days in conference with the school district staff, which presented the Department with written information on the Minnetonka program. However, no formal hearings were held at which all parties were present.
On July 11, 1975, Antell issued a new directive which concluded that Minnetonka was "unable to provide an appropriate special education program for Conley MacFarlane." Antell requested "that Minnetonka pay the cost of Conley's tuition at Groves School for the 1974-75 school year." In his letter to Dr. Draayer, superintendent of Minnetonka schools, Antell offered Minnetonka the opportunity to file exceptions to his proposed order and to request a conference concerning such exceptions. Dr. Draayer requested such a conference by letter to Antell of July 24, 1975. A conference was held on July 31, 1975, at which Minnetonka presented written arguments and questions to the Department.
*623 Antell issued a final decision in the matter on August 13, 1975. In finding that Minnetonka was "unable to provide special instruction and services for Conley MacFarlane," Antell relied in part on "SLBP Guidelines."[3] His decision contained two directives to the Minnetonka School District: First, Minnetonka was ordered to pay the educational cost of Conley's program at Groves School for the 1974-75 school year, and second, Minnetonka was ordered to propose an appropriate educational plan for Conley for the 1975-76 school year. Antell made no findings regarding the program or facilities of the Groves School.
Minnetonka again sought and obtained a writ of certiorari to review the Department's determination. The writ ordered the Department to submit to the court "all the records, exhibits and proceedings with things pertaining thereto" to facilitate the court's review. Antell returned the requested materials, and the Department moved to quash the writ. This motion was denied by the court on March 8, 1976.
The court entered its findings, conclusions, and order on June 3, 1976. After making factual findings substantially as set out above, the court reached 11 conclusions of law which form the basis for the issues examined below. In particular, the court decided:
(1) That Minnetonka was not entitled to a formal adversary hearing regarding Conley's case.
(2) That the delegation of authority by the commissioner of education to his assistant was valid, notwithstanding the fact that it had not been filed with the secretary of state.
(3) That the assistant commissioner had properly utilized the "SLBP Guidelines" in evaluating Minnetonka's program for educating the handicapped.
(4) That substantial evidence supported the Department's decision.
(5) That the assistant commissioner had exceeded his authority in requiring Minnetonka to pay Conley's tuition at the Groves School without investigating that school for its sufficiency to Conley's needs.
The court ordered the matter of payment of tuition to Groves School for the 1974-75 school year set aside and remanded to the assistant commissioner for investigation of the Groves School as a suitable alternative for Conley. Minnetonka's motion for amended findings was denied on September 23, 1976, whereupon the school district brought this appeal.
The legal issues presented are:
(1) In a proceeding initiated by a parent under Minn.St. 120.17, is the commissioner of education required to grant the school district a formal hearing?
(2) Did the commissioner of education validly delegate his authority to investigate and decide upon matters arising under Minn.St. 120.17?
(3) Is the commissioner of education permitted to rely on the "SLBP Guidelines" in evaluating a school district's compliance with Minn.St. 120.17?
(4) Was the final decision of the commissioner in this case supported by substantial evidence?
(5) Is the commissioner of education authorized by Minn.St. 120.17 to select a specific alternative for the education of a handicapped child where it has been determined that the school district cannot provide the necessary services?
1. Appellant Minnetonka argues that it was entitled to a formal, adversary, due process hearing before the commissioner of education. While admitting that a school district is not a "person" entitled to due process as a private citizen, Minnetonka nevertheless asserts its right to a hearing based on the "quasi-judicial" nature of the proceedings under Minn.St. 120.17. The Department's position may be stated as follows: A school district has only those rights *624 conferred upon it by the legislature, and hence has a right to a hearing only where provided by statute or by the constitution; since there is no statute, rule, or constitutional provision expressly granting the district such a right, it was not entitled to a hearing.
The Department does not argue that this matter is not quasi-judicial in nature, nor does it deny that under the Administrative Procedure Act, Minn.St. 15.0418, parties are entitled to hearings in "contested cases." The issue on appeal narrows to whether this matter is a "contested case," and if so, whether this fact alone confers the right to a hearing upon the school district.
"Contested case" is defined by Minn.St. 15.0411, subd. 4:
"`Contested case' means a proceeding before an agency in which the legal rights, duties, or privileges of specific parties are required by law or constitutional right to be determined after an agency hearing. * * *"
This court applied the above definition to a school district in Independent School District No. 581 v. Mattheis, 275 Minn. 383, 147 N.W.2d 374 (1966). That case involved a consolidation of school districts under Minn.St. 122.23, subd. 6, which did not expressly provide for an agency hearing. The court stated the issue to be as follows:
"Since it is conceded that there is no authority in § 122.23, subd. 6, for an agency hearing, it is a necessary prerequisite to determining appellant's legal rights, duties, and privileges only if it is required by the due process provisions of the State and Federal Constitutions." 275 Minn. 386, 147 N.W.2d 376.
In the present case, reference should first be to Minn.St. 120.17. It must be conceded that this statute, as of 1974, gave no authority for an administrative hearing. As in Mattheis, the right of the school district to a hearing is then dependent on constitutional due process. The court in Mattheis held that the school district had no due process right to a hearing, absent a specific statutory grant of such a right. 275 Minn. 387, 147 N.W.2d 377. See, State ex rel. City of LaCrosse v. Rothwell, 25 Wis.2d 228, 130 N.W.2d 806, 131 N.W.2d 699 (1964). In Mattheis we concluded:
"We concur in the [Wisconsin] court's reasoning and conclude that there is neither statutory authority nor a constitutional mandate that an agency hearing be conducted under § 15.0411, subd. 4. The proceedings before the commissioner of education do not, as to an affected school district, constitute a `contested case' within the meaning of § 15.0419 and for that reason the provisions of the Administrative Procedure Act are not applicable." 275 Minn. 388, 147 N.W.2d 377.
Minnetonka seeks to avoid the holding of Mattheis on several grounds. First, it argues that Mattheis and Rothwell apply only to "legislative" proceedings, but not to "quasi-judicial" proceedings as are involved here. No reason appears on the face of the statute to draw this distinction. Further, it is clear that the limitation proposed by Minnetonka would require a separate determination, in each case where a right to a hearing is asserted by a school district or other governmental entity, of whether the proceeding was "legislative" or "quasi-judicial." This result would frustrate the overall purpose of the Administrative Procedure Act to provide a consistent and uniform method of adjudication in the administrative area, because a case-by-case analysis of this type would inevitably result in finely-drawn linguistic distinctions over the meaning of "quasi-judicial." Finally, the relevant inquiry is not to the type of proceeding in which the right to a hearing is alleged, but is rather to the party which is asserting the right. As creatures of statute, governmental entities cannot demand formal hearings based upon constitutional due processthey can do so only based upon a statute conferring the right. Where the statute in question, here Minn.St. 120.17, establishes a "quasi-judicial" procedure but confers no right to a formal hearing upon the school district, it must be assumed that the legislature intended the proceedings to remain informal and nonadversary despite their adjudicative character.
*625 Minnetonka secondly argues that since a parent would be entitled to a hearing, thus implying a "contested case," it is absurd to have a "contested case" for one party and not for the other. The difficulty with this argument is that a parent's entitlement to a hearing would derive from a constitutional due process right as a "person," since § 120.17 does not grant such a right to parents. It follows that a parent could assert such a right, giving rise to a "contested case," while a school district cannot assert the right absent a specific statutory grant. This non-parallel treatment of private persons and governmental entities may not seem equitable to those representing the entity in question, here a school district, but this result is entirely consistent with due process. The right of due process, as effectuated by the concomitant right to a hearing in certain circumstances, was never intended to operate for the benefit of legislatively created bodies. Mattheis, supra.
Minnetonka next argues that it should not be denied its "day in court," citing State, by Peterson v. Anderson, 220 Minn. 139, 19 N.W.2d 70 (1945). The plain answer to this contention is that the present matter is not a court proceeding. Minn.St. 120.17 requires school districts to provide education for handicapped children and establishes a procedure to be followed by parents of such children when they feel the district is not fulfilling its statutory responsibilities as to their children. This procedure is to file an application with the commissioner of education, who then must examine and resolve the controversy. In short, the intent of § 120.17 is to provide a simple evaluative procedure which will not require the parent to become involved in adversary, "in court" proceedings. If the school district could, as to each application filed under § 120.17, demand a formal adversary hearing, it is clear the added burden on the parents and the Department would greatly overweigh any possible benefit to the district for having its "day in court."
Finally, Minnetonka relies upon Minn.Reg.Ed. 581, which defines "contested case" as in Minn.St. 15.0418, and then defines "person" to include "school districts." As correctly noted by the Department, this definition does not help appellant's argument since "the qualifications for entitlement to a hearing under that rule are the same as those established by Minn.St. 15.0411, subd. 4 * * *." Constitutional due process does not extend to school districts or other governmental entities, hence the right to demand a formal due process hearing does not exist absent an express statutory grant. The definition of the school district as a "person" in the regulations does not raise its rights to constitutional dimensions.
The Minnesota School Boards Association as amicus takes the position that the "formal hearing" issue is moot by reason of L.1976, c. 211. That enactment establishes a detailed procedure for handling cases of this type. Minn.St. 120.17, subd. 3b, now provides an "informal due process hearing" at the school district level for parents of handicapped children, and requires a prompt decision by the school district in writing. This decision may be appealed to the commissioner by the parent, with the school board being a necessary party on the appeal. The statute states that on appeal the parent may request a due process hearing pursuant to Chapter 15 (the Administrative Procedure Act), but does not confer such a right upon the school board. The legislature has therefore made clear its position on due process hearings in this area: Parents are entitled to such hearings at both the school district level and before the commissioner, while school boards do not have the right to a due process hearing before the commissioner. Had the legislature intended a contrary result as to school boards, it surely would have said so. In this sense, the "hearing" issue raised by Minnetonka is moot; it does not have a right to a hearing before the commissioner in cases brought under Minn.St. 120.17.
2. Minnetonka contends that the commissioner of education, by failing to comply with Minn.St. 15.06, improperly delegated his authority under Minn.St. 120.17. Specifically, *626 although the commissioner did satisfy the "written order" requirement of § 15.06, the delegation was not filed with the secretary of state as required by that statute. The district court found that, despite this failure of technical compliance with the statute, "the relator was not prejudiced thereby."
Mr. MacFarlane adequately answers this somewhat specious argument. First, the filing requirement can properly be termed "directory" under the rubric of State, by Lord, v. Frisby, 260 Minn. 70, 108 N.W.2d 769 (1961). Of course, if noncompliance with a directory provision results in prejudice to an objecting party, relief may be appropriate, either in the form of correcting the noncompliance itself or in the form of delaying the proceedings to alleviate the prejudicial effect. Here, however, Minnetonka has not shown how it was prejudiced by the lack of a filing. Its brief does not allege prejudice in any form. Further, Minnetonka did not object to the assistant commissioner's handling the matter prior to his final decision. The writ of certiorari to the district court does not raise this objection. The issue was first raised during the certiorari proceedings in the district court. This would therefore appear to be an "afterthought" issue having little to do with the merits of the controversy.
Minnetonka fails to inform the court what kind of relief it seeks based upon this noncompliance with Minn.St. 15.06. Does it want the entire matter remanded to the Department for review by the commissioner? As pointed out by the Department, this is simply not practical. In view of Antell's likely expertise in the area of special education, Minnetonka ought not complain of the delegation unless it can show that it was harmed thereby, warranting a return of the matter to the commissioner. This showing it has not made.
3. Minnetonka next objects to Antell's use of and reliance upon the "SLBP Guidelines" in evaluating its special education program. Minnetonka specifically contends that this reliance was improper in that the Department has not by rule or regulation enforced the guidelines upon school districts. The district court held that Antell "properly utilized [the guidelines] as a standard with which to evaluate the [Minnetonka] program of special education * * *."
It is true that Antell's final decision of August 13, 1975, does refer to the guidelines "on a number of occasions," as Antell admits in his cover letter to Dr. Draayer of Minnetonka. Conclusion No. 3, at page 7 of the decision, explicitly relies on the guidelines. The Department argues, however, that its decision was based upon a number of factors other than the guidelines, including information supplied by Minnetonka itself, requirements of state law, widely recognized standards in education of the handicapped, and the professional reports on Conley MacFarlane. The Department asserts that Minnetonka was aware of the guidelines and relied upon them in developing its own special education programs. The following sentence from Minnetonka's brief is noteworthy: "While Minnetonka recognizes that the `Guidelines' contain helpful and useful goals for the planning, development, and implementation of special education programming, it has never been required until now to conform to the letter of the `Guidelines.'"
No basis appears on this record to disturb the district court's finding. Absent a clear abuse of discretion by the Department of Education, it should be permitted to establish reasonable standards for special education. Indeed, it is commanded by the legislature to do so if Minn.St. 120.17 is to have any meaning. Minnetonka does not allege that the guidelines themselves are in any way arbitrary or unreasonable it admits them to "contain helpful and useful goals." The decision of Assistant Commissioner Antell states with regard to the guidelines:
"It should be noted that the state SLBP Guidelines are quoted on numerous occasions. Edu 122(c)(1) states: `The courses, methods of instruction, and size of classes shall be consistent in the Commissioner's judgment with good educational practices for each type of handicapped *627 child.' The SLBP Guidelines contain the Commissioner's judgment of good educational practice for SLBP."
The courts ought not inquire into the commissioner's judgment in these matters without more justification than has been shown herein. In short, Minnetonka has not sufficiently carried its burden on this issue to justify the court's inquiry into the commissioner's judgment on the standards to be applied under Minn.St. 120.17.
4. Minnetonka argues that the Department's decision herein was not supported by substantial evidence in the record. The parties appear to agree that the substantial evidence test is applicable under Minn.St. 15.0425(e). Minnetonka's argument has two parts: (1) There is no "record" because there was no hearing, and (2) the record is "replete" with hearsay information. The MacFarlane brief correctly states that appellant's burden on this issue is heavyit must show that the findings of the commissioner are not supported by evidence in the record considered in its entirety. Minneapolis Van & Warehouse Co. v. St. Paul Terminal Warehouse, 288 Minn. 294, 180 N.W.2d 175 (1970).
Despite the fact that no formal hearings were held by the commissioner, the return filed by the Department contains voluminous information regarding both Minnetonka's special education program and the needs of Conley MacFarlane. There appears no reason to disturb the district court's finding on this issue, which was as follows:
"The records, reports and data collected by respondent Department of Education and filed with the Return herein provide substantially reliable evidence upon which the Commissioner of Education could base his decision that relator could not provide special instruction and services to Warren Conley MacFarlane during the 1974-75 school year. This Court cannot substitute its judgment for the findings and conclusion of the Assistant Commissioner."
It is, of course, true that there is no oral testimony in the record, since the Department did not feel itself obligated by Minn.St. 120.17 and 15.0411 to grant a formal hearing, but this lack of testimonial evidence is of no consequence.
Minnetonka also objects to the hearsay aspects of the record. The general rule governing the use of hearsay in administrative proceedings is stated in the recent Annotation, "Hearsay Evidence in Proceedings Before State Administrative Agencies," 36 A.L.R.3d 12, 43:
"* * * The general rule is that in the absence of a special statute, an administrative agency cannot, at least over objection, rest its findings of fact solely upon hearsay evidence which is inadmissible in a judicial proceeding."
While Minnetonka is able to point to several specific items in the record which might generally be classified as hearsay, much of the objectionable evidence would be admissible under the admissions and business records exceptions to the hearsay rule. Further, it is reasonable to assume that the commissioner is in a position to judge the inherent trustworthiness and reliability of the evidence before him. Since the formal hearing requirement is not to be imposed on the Department in cases of this nature, it would not be consistent to require strict compliance with the rules of evidence. Only where it appears that the Department clearly abused its discretion in relying upon inherently unreliable evidence, under the hearsay rule or otherwise, should the courts intervene. Again, Minnetonka has not shown this to be the case here.
5. Minnetonka "submits that the Commissioner has no authority under this statute to determine with whom Minnetonka will contract." The district court decided that, while the commissioner did have such authority, he had not properly exercised it in this case by not fully investigating the Groves School as an alternative. Neither respondent contests the remand of the matter to the commissioner for this investigation.
There is statutory authority for the commissioner's determination. First, Minn.St. 120.17, subd. 4, reads in relevant part:

*628 "If the commissioner finds that the local [school] district is not providing such instruction and services, he shall arrange for the special instruction and services provided." (Emphasis added.)
This language is mandatorythe commissioner must make some arrangement to provide the needed services. Minn.St. 120.17, subd. 2(h), permits the commissioner to carry out this mandate by "[c]ontract with public, private or voluntary agencies." Finally, another portion of subd. 4 provides in part:
"If the instruction and services are provided outside the district of residence, * * * any tuition to be paid, shall be paid by the district of residence."
These statutory provisions indicate broad powers on the part of the commissioner to arrange for special education whenever he has found a school district unable to provide it for a particular handicapped child.
The two parts of the commissioner's decision should be noted carefully. The directive was issued on August 13, 1975, and ordered Minnetonka to pay Conley's tuition at Groves School for the 1974-75 school year, which was already past. There was no way, at that point, for the commissioner to have given the school district the range of alternatives it apparently desires. Had the school district been somewhat less adamant in its refusal to provide Conley with alternate instruction, only the second part of the directive would have been necessary. This part ordered Minnetonka to propose an "appropriate educational plan for Conley for the 1975-76 school year." It does not specifically mention Groves School, and allows for the possibility that Minnetonka could itself provide the instruction upon proposal of a satisfactory program. As to the school year already past, the commissioner had little choice but to order the school district to pay costs, assuming Groves School to be a satisfactory alternative. Minnetonka does contract with Groves School concerning other children. The district court properly remanded the matter to the Department for investigation of the Groves School program, to ensure that it was in fact suitable to Conley's needs.
Other than the failure to fully investigate the Groves School, no reason appears on the record or in the statute to find that the commissioner exceeded his authority in this case. If it appears on remand that the Groves School is suitable to Conley's needs,[4] the commissioner's decision will stand as a proper exercise of his powers under Minn.St. 120.27, as correctly decided by the district court. We therefore affirm and remand for further proceedings as ordered by the district court.
Affirmed.
NOTES
[1] This statute had been amended numerous times, most recently by L.1976, c. 211. The provisions quoted herein refer to the law as of 1974, when Mr. MacFarlane filed his initial application.
[2] Minn.St. 15.06, reads in part as follows: "Except as otherwise expressly provided by law, the commissioner or head of any state department or agency shall have the following powers:

* * * * * *
"(2) To delegate to any of his subordinate officers or employees the exercise of such of his powers or duties as he may deem advisable, subject to his control; provided, that every such delegation shall be made by written order, filed with the secretary of state;"
[3] "State Guidelines for Special Learning Behavioral Problem Services" promulgated under Minn. St. 120.17, subd. 3.
[4] In this regard it is perfectly permissible to consider the views of the parent as to the sufficiency of the alternative chosen, in addition to an objective evaluation. Minnetonka seems to imply that the desire of the parent is not a proper factor in the placement decision. In cases involving handicapped children, the perception of the parent of his child's needs, and whether or not they are being met by a particular educational program, should be given great weight in the placement decision. This is true whether the placement decision is being made by the school district or the Department. In this case it would appear that Minnetonka did not give adequate weight to the view of Mr. MacFarlane on the needs of his son and the ability of the school district to supply those needs.