Chelice CARTER, Relator,

v.

OLMSTED COUNTY HOUSING AND
REDEVELOPMENT AUTHORITY,
Respondent.

No. C4–97–978.

Court of Appeals of Minnesota.

Feb. 3, 1998.

Michael W. Hagedorn, Southern Minnesota Regional Legal Services, Inc., St. Paul, and Robert C. Youngerman, Southern Minnesota Regional Legal Services, Inc., Winona, for relator.

Terry L. Adkins, Rochester City Attorney, Thomas M. Canan, Assistant City Attorney, Rochester, for respondent.

Considered and decided by LANSING, P.J., and WILLIS and FOLEY,* JJ.

## OPINION

WILLIS, Judge.

Relator Chelice Carter challenges the sufficiency of the findings and the evidence in support of the termination of her section 8 rental voucher. We reverse.

## FACTS

In 1994, Chelice Carter obtained a section 8 rental voucher for herself and her three daughters through the Olmsted County Housing and Redevelopment Authority (HRA). In the process, she signed a "Statement of Tenant Responsibilities," which provides in part:

> I certify that no person(s), other than those listed on my application, can live/stay/reside with me in my housing unit without prior notice to the HRA. I can have guests/visitors who stay on a tempo-

rary basis for less than a total of thirty (30) days. I understand that I must notify the HRA, within 30 days, if anyone moves in or out of my housing unit.

On August 31, 1995, Carter added Romeo Reccarro, who had legally changed his name from Terry Roundtree but continued to use both names, to her voucher as a member of her household. Reccarro signed a certificate indicating that he had no income. The record includes letters sent to Reccarro at Carter's address dated August 2 and 14, 1995.

On May 24, 1996, Carter's landlord sent a letter to the HRA indicating that a realtor had told him that she had spoken with Reccarro and she "had a house for them," asking if the landlord could terminate the family's lease. The landlord wrote that he had spoken with Reccarro, who said he had looked at several houses and believed he would find one by the end of June 1996. At Carter's termination hearing, she explained that Reccarro had intended to purchase a house on contract for deed, which she understood to mean that no payment was required.

In response to a letter from the HRA, Carter called its office on May 30, 1996, and said that she was not planning to move and was not involved in any of Reccarro's possible plans to buy a house. According to the HRA's record of the call, Carter said that she did not know whether Reccarro had income or not and that he was not a permanent resident of the household, but he stayed at her home when he was in town; she had added him to her voucher "because she was tired of the landlord complaining that he was visiting all the time and didn't want to cause any problems with her housing." Carter's caseworker "informed her that we don't add people to households out of convenience for the tenant or the landlord" and told Carter that she was responsible for reporting Reccarro's income. Carter became "irate" and told the caseworker to have the HRA remove Reccarro from the voucher, which the HRA did.

Carter recertified her tenancy on July 8, 1996, listing herself and the girls as resi-

---

dents. The file contains a handwritten record of a phone call signed by Carter's caseworker, dated July 17, 1996, stating simply: "Per Laurie Dubois—[landlord's] daughter[,] Terry is still there." The HRA sent Carter a letter stating that it would terminate her voucher if Reccarro was occupying the unit or receiving mail at Carter's address.

The record gives no information regarding Reccarro's whereabouts between July and September 1996. Reccarro submitted a notarized statement by a person named Susan West, stating that he moved in with her on October 18, 1996, although a statement prepared for a lawsuit Reccarro brought against the Rochester school district, which employed him for approximately a month in October and November 1996, places Reccarro at West's address in September 1996. Correspondence regarding Reccarro's termination by the school district was sent to West's address. The record includes two pieces of correspondence sent to Reccarro at Carter's address between July 1996 and March 1997: an insurance application dated November 10, 1996, and a notice from an insurance company's collection division dated January 25, 1997.

West's affidavit states that she "put [Reccarro] out of [her] home" on March 14, 1997. On March 10, 1997, Reccarro told a food stamp worker to send his stamps to Carter's address, and on March 11, Reccarro listed Carter's address on some paperwork for the STRIDE work experience program. On March 14, a deposit slip related to a bank account of Reccarro's was sent to Carter's address; the slip does not indicate whether the account contained any money.

On March 17, Carter contacted the HRA asking to have Reccarro once again added to her voucher as a resident of her household. A new caseworker called Carter and said that, due to new regulations, the HRA would need to do a background check on Reccarro and that she and Reccarro would have to come in for an interview. The HRA's event record states that Carter became upset and said that she would not come to the interview and that when the caseworker called Carter again on March 18, Carter was "very irate" and "used some vulgar language." Carter asked what would happen if she did not "sign the form" and was told she could lose her assistance. Carter then said that Reccarro would not be moving in. Later that morning, Reccarro came to the office and told Carter's caseworker: "I don't know why you didn't just call me to set up an appointment and I am sick of this." The report states that Reccarro "slammed" an envelope on the counter and told the caseworker that all the information she needed would be in there and that he would be back to reclaim it. He then said in a loud voice, "Don't mess with my civil rights." The same day, the HRA sent Carter a letter stating that "a visitor is defined as someone who already has a permanent night time residence."

The next day, Reccarro called the HRA, claiming that he had given the caseworker the wrong envelope and wanted it returned to Carter's address. The caseworker instead opened the envelope, which contained a resume describing Reccarro as a "child care/home teach assist[ant]" from October 1996 to present, a "class assistant" from January 1990 to present, and a "PCA burn victim/home teach assist[ant]" from June 1993 to October 1996. On March 31, the caseworker wrote Carter asking for Reccarro's 1995 and 1996 tax returns. Instead, on April 10, Reccarro sent the HRA a letter stating that he was "mov[ing] out" of Carter's residence as of that date. He also included letters from Carter and from a person named Ronnie Williams, who stated that Reccarro was moving in with Williams and Reccarro would provide Williams's address.

On April 15, 1997, the HRA wrote to Carter stating that her assistance was being terminated because "it appears that Romeo Reccarro has been living at your unit for several months without the consent of the [HRA]" and because Reccarro's resume "suggest[ed]" that he was employed and Carter had failed to provide Reccarro's tax returns "to determine if a back payment was owed." Carter requested a hearing, at which both she and Reccarro explained that he had intended to move in with Carter after being evicted from West's residence but, after learning of the background check requirement, elected to leave Carter's residence on April 10 in order to count his occupancy as a visit lasting less than 30 days. Reccarro also

explained that the jobs listed on his resume were unpaid volunteer or intern positions for which he was reimbursed only transportation expenses but that he had "embellished" the resume in order to look more attractive to employers and he had paid no taxes in 1995 or 1996 due to insufficient income. The HRA apparently contacted none of the listed employers to determine whether Reccarro was telling the truth.

The volunteer hearing officer sent Carter a letter upholding the termination; the letter consisted primarily of a list of the documents the HRA had submitted. The hearing officer did not mention Carter's or Reccarro's testimony or any of the documents tending to prove their version of events. Following his listing of documents, the hearing officer concluded: (1) that Reccarro was in fact living with Carter and not visiting because (a) "no other permanent address was ever given to me," (b) Reccarro could not "move out," as stated in the April 10 letters, unless he was living there, and (c) Reccarro received mail at Carter's address before and after his official tenure in her household; and (2) that Reccarro had income during the time he had signed a zero income statement because (a) his resume indicated he was employed, (b) Carter failed to provide his tax returns, and (c) Carter was aware that Reccarro at one point intended to buy a house. The hearing officer also included a finding that Carter and Reccarro had been "threatening and abusive" of HRA personnel.

Carter appeals the sufficiency of the findings and of the evidence, as well as the hearing officer's use of the alleged "threatening and abusive" conduct as a basis for termination when Carter had been given no notice that she was accused of it. On appeal, the hearing officer provided a "Statement of Proceedings," which in large measure simply recites the list of documents in the file, but adds that "Reccarro's testimony was very vague and his tone was defensive. * * * Reccarro gave me the impression he would pounce on anyone who questioned him." We reverse.

## ISSUES

1. Did the hearing officer state his findings with sufficient specificity to sustain the termination?

2. Did the hearing officer abuse his discretion in determining that the evidence was sufficient to uphold the termination?

## ANALYSIS

By taking evidence and hearing testimony, the HRA acted in a quasi-judicial capacity. *See American Fed'n of State, County & Mun. Employees, Council 14 v. County of Ramsey,* 513 N.W.2d 257, 259 (Minn.App.1994). An agency's quasi-judicial determinations will be upheld unless they are unconstitutional, outside the agency's jurisdiction, procedurally defective, based on an erroneous legal theory, unsupported by substantial evidence, or arbitrary and capricious. *Hiawatha Aviation v. Minnesota Dep't of Health,* 375 N.W.2d 496, 501 (Minn.App. 1985), *aff'd,* 389 N.W.2d 507 (Minn.1986).

### I. Sufficiency of Findings

Agency action must be "based on objective criteria applied to the facts and circumstances of the record at hand. [Agency] discretion is not unlimited and must be explained." *In re Northwestern Bell Telephone Co.,* 386 N.W.2d 723, 727 (Minn.1986). In order to facilitate appellate review, an administrative agency must state the facts and conclusions essential to its decision with clarity and completeness. *People for Environmental Enlightenment & Responsibility (PEER), Inc. v. Minnesota Environmental Quality Council,* 266 N.W.2d 858, 871 (Minn. 1978). The agency must explain on what evidence it is relying and how that evidence connects rationally with its choice of action. *Hiawatha Aviation,* 375 N.W.2d at 501. Applying eighth circuit precedent, the United States District Court for the District of Minnesota has held:

> To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the record which have led to the rejection of the Plaintiff's testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting pertinent testimony. * * * These requirements are not suggestive guidelines, but are mandates which

impose affirmative duties upon the deliberative process.

*Garthus v. Secretary of Health & Human Servs.*, 847 F.Supp. 675, 689 (D.Minn.1993) (citations omitted). The *Garthus* opinion draws no distinction between decisions by a lay hearing officer and by a legally trained administrative law judge, and we find it applicable here because administrative law ultimately derives from federal due-process standards.

The Minnesota Supreme Court addressed the necessity of an agency's findings in *White Bear Rod & Gun Club v. City of Hugo*, 388 N.W.2d 739 (Minn.1986). The city of Hugo denied a gun club's application for a special use permit based on:

> Item 1, information in * * * [a letter by a council member to the council]; Item 2, the new petition with over 250 names against the Gun Club; Item 3, past court cases; Item 4, information from other governmental agencies; Item 5, the state statutes; Item 6, the Hugo's Comprehensive Plan; Item 7, all materials submitted at the February 6th, 1985 public hearing; [Item 8,] Hugo City Code Book; and No. 9, the information on file at the Hugo City Hall.

*Id.* at 742 n. 3. The court noted that the club had submitted expert testimony and had offered to restrict the days and hours on which shooting would occur, concluding that "[w]e are left in the dark as to what the city council made of all this evidence." *Id.* at 742 n. 4.

In this case, the findings are slightly more detailed than those in *White Bear*, but still do not rise to the level required by *Hiawatha Aviation* and *Garthus*. The hearing officer simply fails to mention Carter's and Reccarro's testimony or any of the documentary evidence that does not support his conclusion and gives no explanation as to why he chose to disregard it.[1]

On appeal, the hearing officer has submitted a "Statement of Proceedings," supposedly pursuant to Minn. R. Civ.App. P. 110.03. This rule provides that, where a transcript is unavailable, the *parties* may prepare a statement of proceedings, and both parties and the trial court must agree on the content of a statement before its submission. *Id.* Here, there is no indication that the parties approved the statement, and it is highly unlikely that Carter would have approved of the hearing officer's characterization of Reccarro as ready to "pounce on anyone who questioned him." We therefore disregard the purported statement of proceedings in determining the insufficiency of the hearing officer's findings.

■ In general, a decision not supported by proper findings is considered "prima facie arbitrary," and the decision-making body bears the burden of proof on the appellate level. *White Bear*, 388 N.W.2d at 742 n. 5 (citing *Corwine v. Crow Wing County*, 309 Minn. 345, 352, 244 N.W.2d 482, 486 (1976)). We are satisfied that the evidence fails to support the hearing officer's conclusion even under a more deferential standard of review.

## II. Sufficiency of Evidence

■ An administrative agency's decision must be supported by "substantial" evidence, defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Soo Line R. Co. v. Minnesota Dep't of Transp.*, 304 N.W.2d 301, 305–06 (Minn.1981) (quoting *Minneapolis Van & Warehouse Co. v. St. Paul Terminal Warehouse Co.*, 288 Minn. 294, 299, 180 N.W.2d 175, 178 (1970)). Substantial evidence means more than a scintilla of evidence, "some" evidence, or "any" evidence. *Hiawatha Aviation*, 375 N.W.2d at 501. On appeal, the appellant must demonstrate that the administrative agency's findings are not supported by the record when considered in its entirety, and this court applies an abuse of discretion standard. *State ex rel. Indep. Sch. Dist. No. 276 v. Department of Educ.*, 256 N.W.2d 619, 627 (Minn.1977). "This court cannot uphold the decision merely on the basis of evidence which in and of itself justifies it without taking into account contradictory evidence or evidence from which con-

---

1. The hearing officer included a finding regarding Reccarro's use of two names, apparently intending it as a credibility determination. But even if this establishes Reccarro as dishonest in some way, it does not explain away the documentary evidence in support of Reccarro's and Carter's claims, which is discussed below.

flicting inferences can be drawn." *Liffrig v. Independent Sch. Dist. No. 442*, 292 N.W.2d 726, 729 (Minn.1980).

Federal section 8 regulations do not address burdens of proof, but U.S. Supreme Court precedent indicates that, where deprivations of benefits necessary for survival are concerned, the initial burden of proof must fall on the government. *See Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018–19, 25 L.Ed.2d 287 (1970) (emphasizing importance of welfare benefits to recipients and detailing due process protections).

## A. Reccarro's residence in Carter's household

The question of whether Reccarro was an unauthorized resident of Carter's household involves a threshold issue of interpretation of the Statement of Tenant Responsibilities that Carter signed. The HRA argues that because Reccarro did not have a "regular night time residence" elsewhere, Carter needed to ask the HRA for permission before allowing him to live in her home for any period of time. This "regular night time residence" language, however, is not in the statement Carter signed, nor in any federal regulation we have found.

While the statement Carter signed provides that no one who is not listed on the application may live in the home "without prior notice to the HRA," it also provides that the tenant "must notify the HRA, within 30 days, if anyone moves in * * * [the tenant's] unit." We read these provisions together, and with the 30-day visitor rule, to mean that a tenant violates the Statement of Tenant Responsibilities only if she fails to seek the addition to the voucher of a new resident within 30 days after his arrival. Carter applied to add Reccarro to her voucher on August 31, 1995, and again on March 17, 1997. The file shows that Reccarro received correspondence at Carter's address dated August 2 and 14, 1995, and used her

address on several dates after March 10, 1997. In both August 1995 and March 1997, Carter duly reported Reccarro's residence within the required 30 days after the first indication of his presence, and we therefore will not consider evidence from August 1995 or March 1997 in determining whether Carter violated section 8 requirements.[2]

The record contains only three pieces of evidence tending to indicate that Reccarro resided with Carter beyond the period in which he was listed on the voucher or the two 30-day periods preceding Carter's requests to have him added: (1) the July 1996 phone message from the former landlord's daughter saying Reccarro was "still there," (2) the insurance application sent to Carter's home in November 1996, and (3) the insurance notice sent in January 1997. The January 1997 notice states that Reccarro had failed to respond to a previous notice, which could indicate that both notices were sent to an outdated address. Moreover, the file contains several pieces of correspondence from the Rochester school district that were sent to Reccarro at West's address in November 1996, as well as Reccarro's responses to those letters. This evidence, which the hearing officer did not mention, is consistent with West's statement that Reccarro lived with her at the time the November 1996 insurance application was sent to Carter's address. By contrast, the record contains no evidence indicating when Reccarro last made contact with the insurance company. By themselves, the insurance application and notice constitute a scintilla of evidence but not substantial evidence in light of the record as a whole.

The only remaining piece of evidence supporting the allegation that Reccarro lived with Carter in violation of section 8 regulations is the record of the phone call from the landlord's daughter. Although hearsay is admissible in administrative proceedings and the record contains no other evidence re-

---

2. The HRA interprets Reccarro's use of Carter's address after March 10, 1997, as contradictory to West's affidavit, which states that she evicted him on March 14. The affidavit, however, does not say that West evicted Reccarro without notice. The file includes an undated note from Reccarro to his food stamp worker indicating an intention to move "back" in with Carter. A

possible explanation of the evidence as a whole, not addressed by the hearing officer, is that Reccarro began making arrangements to stay with Carter, such as using her address for future correspondence and changing the address on his food stamps, after West gave Reccarro notice that she intended to evict him.

garding Reccarro's whereabouts in July 1997, the record does not indicate what facts led the caller to believe that Reccarro was residing with Carter rather than visiting or even that he was present. We conclude that this also is insufficient to establish the preponderance of the evidence necessary to deprive Carter of her housing assistance. *See Independent Sch. Dist. No. 276*, 256 N.W.2d at 627 (holding that administrative findings may not rest solely on hearsay inadmissible in court).[3]

The hearing officer upheld the sufficiency of the evidence based on (1) the absence of another permanent address for Reccarro, (2) the fact that mail was sent to Reccarro at Carter's address before and after the period when he was listed on the voucher, and (3) Reccarro's statement in his April 10 letter that he was "mov[ing] out" of Carter's home. We have concluded that the first basis has no legal significance and the second provides insufficient factual support. The third basis amounts to semantics, and Reccarro's statement could also be consistent with Carter's account that he lived with her for 30 days for lack of another option. In light of the record as a whole, even taking into account evidence tending to impeach Carter's and Reccarro's credibility on other issues, we conclude that the record does not provide substantial evidence from which a reasonable finder of fact could conclude that the HRA carried its burden of proving that Reccarro lived with Carter in violation of section 8 regulations.

## B. Unreported income

The HRA presents a somewhat closer case regarding its claim that Reccarro failed to report income, but it is still inadequate in light of the record as a whole. The hearing officer based his determination that Reccarro had unreported income on (1) Reccarro's resume and (2) Reccarro's alleged plans to buy a house in June 1996. But the record also includes Reccarro's March 1997 application for an unskilled and apparently unpaid job through the STRIDE work experience pro-

gram, which would be inconsistent with a contention that he was already working two paid jobs. In addition, the resume exaggerates the length of Reccarro's employment with the Rochester school district, which supports his claim of "embellishment," and West's affidavit states that Reccarro was unemployed at the time she evicted him.

The house purchase appears never to have taken place, and the record includes no information about its nature other than Carter's statement at the hearing that she understood the purchase was to be on a contract for deed. While this incident provides some evidence that Reccarro may have had income in May 1996, we conclude that, without more, it does not rise to the level of substantial evidence.

Even if the resume and the rumored house purchase constituted sufficient evidence that Reccarro broke section 8 rules by failing to report income, we conclude that under the circumstances, the hearing officer abused his discretion in terminating Carter's certificate without considering whether she even knew that Reccarro had unreported income. *See* 24 C.F.R. § 982.552(c)(1)-(2) (1996) (granting agency discretion to consider extent of participation or culpability of individual family members and exclude only specific parties who break section 8 rules); *Juster Bros. v. Christgau*, 214 Minn. 108, 118, 7 N.W.2d 501, 507 (1943) (stating that exemption of administrative bodies from strict legal rules of evidence and procedure does not grant license to substitute presumptions for facts). Carter's vehement denial of any intention to relinquish her section 8 housing at the time Reccarro was allegedly purchasing a house and her eviction of Reccarro as soon as it appeared that her housing was in jeopardy support her contention that she was not involved in any accumulating of income for a proposed home purchase.

---

**3.** The HRA argues that this evidence would be admissible under Minn. R. Evid. 803(8)(B) as a "[matter] observed pursuant to duty imposed by law as to which [matter] there was a duty to report." But Minn. R. Evid. 803(8) applies only to statements made by public officials, so while the note from the caseworker would be admissi-

ble hearsay, the underlying statement by the landlord's daughter would not. *See City of Fairmont v. Sjostrom*, 280 Minn. 87, 93, 157 N.W.2d 849, 853 (1968) (holding that where informant to official who made record is under no duty to report truthfully, record is not admissible).

### C. Failure to supply Reccarro's tax returns

Carter does not dispute that she did not supply any of Reccarro's tax returns. Failure to supply requested information for use in determining whether the family meets income requirements may be grounds for termination. *See* 24 C.F.R. §§ 982.551(b)(2), 982.552(b)(1) (1996) (creating obligation of family receiving assistance to provide information and providing that violation of any family obligation is grounds for termination). But failure to provide tax returns cannot be used as a basis for termination without some indication that such returns existed. "Imposing an impossible burden is an arbitrary decision." *Hiawatha Aviation*, 375 N.W.2d at 502. Even if the evidence described provides sufficient support for a finding that Reccarro had unreported income, the record contains no information regarding whether he had income that reached the level at which he would be required to file a tax return. *See* 26 U.S.C. § 6012(a)(1)(A)(i)-(ii) (1996) (providing that filing return not required when gross income does not exceed amount of standard deduction plus personal exemption).

### III. Other Claims

The HRA essentially concedes in its brief that the hearing officer improperly referred to Carter's and Reccarro's alleged "threatening and abusive" behavior because Carter was not informed that the HRA was seeking termination on this ground. *See* 24 C.F.R. § 982.552(b)(10) (1996) (providing that use or threat of abusive or violent behavior toward housing authority personnel is ground for termination). Because of our disposition of this case, we need not decide whether this was harmless error. We also need not address Carter's claim, first raised in her reply brief, that the authority's failure to allow her to examine the witnesses against her violated her due process rights.

### DECISION

We conclude that the hearing officer's failure to explain his decision to disregard the evidence offered in support of Carter's claim rendered his findings legally insufficient and that the evidence offered by the HRA, viewed in light of the record as a whole, does not rise to the level of the substantial evidence necessary to support a termination of Carter's section 8 certificate.

**Reversed.**