*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1301**

Christine M. Berglund,
Relator,

vs.

Kozlak's Royal Oak Rest Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed June 15, 2015
Reversed
Hooten, Judge**

Department of Employment and Economic Development
File No. 32482423-3

Laura Melnick, Samantha Clawson, Law Offices of Southern Minnesota Regional Legal Services, Inc., St. Paul, Minnesota (for relator)

Kozlak's Royal Oak Restaurant, Inc., Shoreview, Minnesota (respondent employer)

Lee B. Nelson, Munazza Humayun, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

Considered and decided by Hooten, Presiding Judge; Schellhas, Judge; and Klaphake, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**HOOTEN**, Judge

Relator challenges the determination by an unemployment law judge (ULJ) that she is ineligible for unemployment benefits because she was discharged for employment misconduct, arguing that: (1) the ULJ's findings of fact are not supported by substantial evidence in the record; and (2) the ULJ erred by applying an incorrect legal standard to determine whether relator made consistent efforts to control her chemical dependency. We reverse.

## FACTS

Relator Christine M. Berglund was an employee of respondent Kozlak's Royal Oak Rest Inc. (Kozlak's) from July 2000 until January 25, 2014. After Berglund's employment ended, she applied for unemployment benefits with respondent Minnesota Department of Employment and Economic Development (DEED). DEED initially determined that she was ineligible for unemployment benefits because she was discharged for employment misconduct. Berglund appealed this determination, and a ULJ held a telephonic hearing at which Berglund and her former manager, L.S., testified to the following.

Throughout her 13-year employment with Kozlak's restaurant, Berglund worked part-time as a server. On January 25, 2014, Berglund reported to work under the influence of alcohol. At an employee meeting, Berglund interrupted L.S. multiple times. Later that evening, two employees came up to L.S. and told her that they suspected that Berglund was intoxicated. L.S. observed Berglund "stumbling in the kitchen," so she

took Berglund aside and confronted her about her intoxication. When L.S. asked Berglund for her keys, Berglund "got belligerent." She "started yelling and screaming" at L.S., using profanity within earshot of customers. An employee "grabbed [Berglund] lightly by the forearm" to try to get her into the kitchen, and Berglund "started swinging punches" at the employee. L.S. believed that Berglund struck the employee on the arm. L.S. then called the police. Police officers eventually arrived and drove Berglund home.

L.S. wrote up an "Employee Termination Notice" that night, which stated that the date of termination was January 25, 2014. The "[r]eason for termination" listed on the form was "[i]nsubordination." L.S. provided a detailed description of the incident on the form. Berglund testified that her memory of the incident was not very detailed. She admitted that she was "quite intoxicated," which was why she did not "really remember exactly how everything happened." L.S. testified that a provision in Kozlak's employee handbook provided that, if an employee came to work under the influence of alcohol, it was grounds for "immediate dismissal." Berglund testified that she received the handbook back in 2000 and was aware of this provision.

The next morning, Berglund called Kozlak's because "she wanted to know if she was fired." L.S. was not on duty that morning, but Berglund talked to another manager. L.S. testified that the manager told Berglund to call back later when L.S. was working. L.S. testified that Berglund never called back or came in to discuss the incident. Berglund testified that she did not call L.S. back and never called anyone at Kozlak's to discuss her employment because she felt "really embarrassed" about the incident and she "assumed that [she had] been fired."

When the ULJ asked Berglund, "Did you quit or were you discharged[?]" Berglund stated that she was discharged. She noted, however, that nobody from Kozlak's ever told her that she was discharged. L.S. testified that Berglund was discharged because she was "drunk and disorderly" during work hours. However, L.S. testified that nobody ever told Berglund she was discharged. L.S. also testified: "I guess I assume when you come in [to work intoxicated], you start fighting with employees . . . I guess I just assumed she knew [she was fired], and she never called me back and asked the question . . . ."

Berglund testified that her conduct on January 25 was a consequence of her alcohol dependency. In a brief letter dated May 5, 2014, Berglund's primary care physician stated that Berglund had "been struggling with chemical dependency of alcohol formally diagnosed in July 2012" and that she was "prescribed a treatment program at that time." Consistent with this letter, Berglund testified that her physician first diagnosed her as chemically dependent on alcohol in July 2012. But, Berglund testified that she did not think that she was prescribed "a treatment program" at that time by her physician to address her chemical dependency. Berglund never told Kozlak's that she was chemically dependent or asked for a leave of absence in order to enter treatment. There is no evidence in the record that, prior to the January 2014 incident, Berglund's chemical-dependency issues interfered with her ability to work and, in fact, her supervisor testified that she was unaware that Berglund had a chronic chemical-dependency problem.

4

Additional medical evidence was introduced into the record regarding Berglund's efforts to control her chemical dependency. On August 26, 2013, Berglund saw her physician for her annual physical examination. The clinical notes from this visit listed alcohol abuse as one of Berglund's assessed problems. The treatment plan from this visit stated, in relevant part: "[Counseling] to help with all of your new adjustments and drinking." After the August 2013 visit, Berglund began seeing a psychologist for her alcohol dependency. Berglund received counseling from her psychologist a total of nine times between August 2013 and the January 2014 incident. The therapy focused on cognitive and behavioral issues, such as Berglund understanding how she could stop drinking, understanding why she was drinking, finding a safe way to quit drinking, finding other activities to replace drinking, and finding social supports to help her stay sober. Berglund testified that her psychologist had advised her that she should not quit drinking immediately but, in order to avoid the harsh effects of detoxification, she should "try and wind down" her drinking. During the course of Berglund's treatment with her psychologist, there was no indication that her psychologist or any other medical provider recommended that she attend a formal inpatient or outpatient chemical-dependency treatment program or Alcoholics Anonymous.

Berglund testified that, during the five months that she treated with her psychologist, she was able to decrease the level of her consumption of alcohol. She acknowledged that she "was not totally abstinent," but stated that she "was doing [her] best to refrain from drinking" every day. Vodka was her drink of choice. For a few weeks in December 2013, she tried switching from vodka to beer in order to "try to get

[herself] off'" vodka. She stated that, prior to August 2013, she was consuming two 1.75-liter bottles of vodka every five to six days. After August 2013, she was consuming roughly four to five drinks per day.

The ULJ issued an order denying Berglund unemployment benefits on the basis that she was discharged due to employment misconduct, such misconduct was a consequence of her chemical dependency, and she failed to make consistent efforts to control her chemical dependency. The ULJ found that, during the time that Berglund was treated by her psychologist, she increased, rather than decreased, her consumption of alcohol, but failed to tell her psychologist of this increase. The ULJ rejected Berglund's testimony that none of her doctors had recommended that she attend a formal chemical-dependency treatment program, claiming that such testimony was inconsistent with the evidence received at the hearing. While the ULJ found that Berglund made "some efforts" to control her chemical dependency, she concluded that she did not make "consistent efforts" to do so. The ULJ found that her efforts to control her chemical dependency "were inconsistent without evidence of any period of cessation in [her] consumption of alcohol" and that her level of chemical abuse never "reached any acceptable level or ceased being a problem at any time."

On reconsideration, the ULJ affirmed her decision. The ULJ found that Berglund's claim that she made consistent efforts to control her chemical dependency was "not plausible." The ULJ pointed out that there was no evidence that her psychologist had "knowledge, education and training in chemical dependency treatment" or that she "developed a comprehensive plan to treat Berglund's physical addiction as

6

well [as her] psychological problems." The ULJ emphasized the limitations and lack of detail in the psychologist's letters about Berglund's alleged consistent efforts. The ULJ now found that Berglund failed to show that she made "any effort" to cease her consumption of alcohol. This certiorari appeal followed.

## D E C I S I O N

The purpose of chapter 268 is to assist those who are unemployed through no fault of their own. Minn. Stat. § 268.03, subd. 1 (2014). The chapter is remedial in nature and must be applied in favor of awarding benefits, and any provision precluding receipt of benefits must be narrowly construed. Minn. Stat. § 268.031, subd. 2 (2014). "An applicant's entitlement to unemployment benefits must be determined based upon [the] information available without regard to a burden of proof." Minn. Stat. § 268.069, subd. 2 (2014).

We review a ULJ's decision to determine whether a relator's substantial rights have been prejudiced by legal errors, findings or conclusions not supported by substantial evidence, or a decision that is arbitrary and capricious. Minn. Stat. § 268.105, subd. 7(d)(3)–(6) (2014). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Carter v. Olmsted Cnty. Hous. & Redev. Auth.*, 574 N.W.2d 725, 730 (Minn. App. 1998) (quotation omitted). "Substantial evidence means more than a scintilla of evidence, 'some' evidence, or 'any' evidence." *Id.* "An appellate court will exercise its own independent judgment in analyzing whether [a relator] is entitled to unemployment benefits as a matter of law."

*Irvine v. St. John's Lutheran Church of Mound*, 779 N.W.2d 101, 103 (Minn. App. 2010).

"Whether an employee engaged in conduct that disqualifies the employee from unemployment benefits is a mixed question of fact and law." *Stagg v. Vintage Place Inc.*, 796 N.W.2d 312, 315 (Minn. 2011) (quotation omitted). Whether an employee committed a particular act is a question of fact viewed in the light most favorable to the ULJ's decision and affirmed if supported by substantial evidence. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006). But, we review de novo the legal question of whether the particular act committed by the employee constitutes employment misconduct and whether an exception applies. *See id.*

In general, an employee who is discharged by an employer for employment misconduct is ineligible for unemployment benefits. Minn. Stat. § 268.095, subds. 4, 6 (2014). "Employment misconduct means any intentional, negligent, or indifferent conduct, on the job or off the job[,] that displays clearly: (1) a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee; or (2) a substantial lack of concern for the employment." *Id.*, subd. 6(a). Notwithstanding this general definition, employment misconduct does not include "conduct that was a consequence of the [relator's] chemical dependency, unless the [relator] was previously diagnosed chemically dependent or had treatment for chemical dependency, and since that diagnosis or treatment has failed to make consistent efforts to control the chemical

dependency." *Id.*, subd. 6(b)(9). Berglund claims that she falls under this chemical-dependency exception to the employment-misconduct rule.[1]

For Berglund to meet the chemical-dependency exception under the statute, the evidence must show that: (1) she was discharged because of employment misconduct; (2) the employment misconduct was a consequence of her chemical dependency; (3) she was previously diagnosed as chemically dependent or had treatment for chemical dependency; and (4) she made consistent efforts to control the chemical dependency since the diagnosis or treatment. *See* Minn. Stat. § 268.095, subds. 4(1), 6(a), 6(b)(9). Berglund does not challenge the ULJ's conclusion that her conduct on January 25, 2014, meets the general definition of employment misconduct and that she was discharged for such misconduct. Nor does Berglund challenge the ULJ's implicit conclusion that the employment misconduct was a consequence of her chemical dependency. Instead, Berglund contends that the ULJ incorrectly concluded that she failed to make consistent efforts to control her chemical dependency, which led the ULJ to incorrectly determine that she did not meet the chemical-dependency exception.

---

[1] Berglund does not challenge the ULJ's finding that she was discharged. In its brief, DEED does not respond to Berglund's arguments in her brief, but instead argues that, because Berglund quit and was not discharged, she is ineligible for employment benefits. DEED asks this court to either modify the ULJ's decision or to remand for the ULJ to reconsider the issue of whether Berglund quit or was discharged. DEED's request is improper for two reasons. First, the Commissioner of DEED failed to request reconsideration within 20 days of the ULJ's initial decision, as required under Minn. Stat. § 268.105, subd. 2 (2014). Second, as a result, DEED is not a "petitioner" under section 268.105, subd. 7(d), and therefore is not entitled to appellate relief. Accordingly, for purposes of this opinion, we accept the ULJ's determination that Berglund was discharged from her employment as a result of the incident on January 25, 2014.

Relying on *Moeller v. Minnesota Dep't of Transp.*, Berglund argues that the ULJ applied the wrong legal standard by focusing on results rather than on Berglund's efforts to control her chemical dependency. 281 N.W.2d 879 (Minn. 1979). At the time *Moeller* was decided, Minnesota's unemployment-insurance statute recognized an exception to the employment-misconduct rule if the misconduct was "due to [the relator's] own serious illness" and the relator "ha[d] made reasonable efforts to retain his employment." *See* Minn. Stat. § 268.09, subd. 1(b) (1978). The supreme court stated that "[a]lcoholism is a chronic illness characterized by remissions and exacerbations. . . . Given the nature of the disease, it is unreasonable to require the [relator] to maintain total abstinence even after he enters treatment." *Moeller*, 281 N.W.2d at 882 (citation omitted). A year later, the Minnesota Legislature codified this rule into the statute. *Leslin v. Cnty. of Hennepin*, 347 N.W.2d 277, 279 (Minn. 1984). Seven years after *Moeller*, the supreme court clarified: "Although the statute does not require an individual [to] totally abstain from alcohol or achieve total success in treatment, the individual must make consistent efforts to control his illness. *The focus is upon an individual's efforts, not his results*." *Umlauf v. Gresen Mfg.*, 393 N.W.2d 198, 200 (Minn. 1986) (emphasis added) (citation omitted).

Here, the ULJ initially found that Berglund "made some efforts to control her chemical dependency," "attended counseling," and "saw the counselor on nine occasions during the period [of] August 26, 2013 to January 25, 2014." But, in denying unemployment benefits, the ULJ concluded that Berglund's "efforts to control her chemical dependency were inconsistent without evidence of any period of cessation in Berglund's consumption of alcohol." The ULJ also stated that there was "no evidence of

10

a cessation in Berglund's consumption of alcohol for any substantial period." Inexplicably, in her order of affirmation, the ULJ found that "[t]here was insufficient evidence that Berglund made *any* effort to cease her consumption of alcohol during any period." (Emphasis added.) By focusing upon the results of Berglund's treatment, rather than Berglund's efforts in controlling her chemical dependency, the ULJ erred as a matter of law by requiring that there be a period of cessation. *See id.*; *see also Moeller*, 281 N.W.2d at 882.

Moreover, the ULJ's finding that "Berglund's level of chemical abuse was not shown to have reached any acceptable level or ceased being a problem at any time" also emphasizes results over efforts. Not only was this conclusion inappropriately focused upon the results of Berglund's treatment, but it was also based upon the assumption that Berglund's level of alcohol consumption actually increased during the five months that she received treatment from her psychologist prior to her discharge. Yet, at the hearing, Berglund testified that, during this period, her alcohol use actually "went down." When the ULJ pressed her for specifics, Berglund testified that her drinking *decreased* from two 1.75-liter bottles of vodka every five to six days, to four to five drinks of vodka per day. Because Berglund's testimony was the only evidence regarding the level of her consumption of alcohol during the five months that she treated with her psychologist, and there is nothing in the record to support the ULJ's determination that Berglund increased her consumption during this period, we conclude that the ULJ's determination is unsupported by substantial evidence.

In reviewing Berglund's efforts to control her chemical dependency, the record demonstrates that, since her August 2013 assessment, she followed up with her physician's referral and recommendation that she seek counseling. Over the course of the next five months, she underwent nine sessions of cognitive-behavioral therapy with her psychologist for her alcohol dependency, which focused on how Berglund could stop drinking alcohol safely. The therapy also focused on helping Berglund find other activities to replace drinking and finding the social supports she needed to become and remain sober. There is nothing in the record indicating that Berglund failed to attend these scheduled counseling sessions or that her psychologist was dissatisfied with Berglund's efforts during this period of treatment. And, consistent with Berglund's testimony that she was to gradually decrease her drinking, there is nothing in the psychologist's medical report that indicates that Berglund was told to stop drinking prior to her discharge.

Although the ULJ was critical of the treatment provided to Berglund, there is no evidence that her psychologist, who was licensed, was unqualified to render counseling for chemical-addiction problems. And, consistent with Berglund's testimony and contrary to the determination of the ULJ, there is no indication in the months prior to Berglund's discharge that either her psychologist or her physician recommended that she attend a formal inpatient or outpatient chemical-dependency treatment program. In a very brief May 2014 letter, her physician noted that Berglund was diagnosed with chemical dependency in July 2012 and that "a treatment program" was recommended for her at that time. The letter also noted that, during the August 2013 assessment, she

12

recommended that Berglund "restart cognitive therapy and alcohol treatment program." Her physician's contemporaneous clinical notes from the August 2013 assessment indicate that she referred Berglund for "[counseling] to help with all of [her] new adjustments and drinking," but there is no referral or recommendation in the clinical notes regarding a formal inpatient or outpatient chemical-dependency treatment program. Consistent with her physician's clinical notes, shortly after this August 2013 referral, Berglund began treating with a psychologist for her chemical-dependency issues. The psychologist observed in her May 15, 2014 letter that it was only after Berglund's discharge from employment that she "recommended total abstinence from alcohol with in or out patient treatment *if needed*." (Emphasis added.) We agree with Berglund that her physician's cursory letter referring to "cognitive therapy and alcohol treatment program," when coupled with the physician's clinical notes referring Berglund only to counseling, fails to support the ULJ's determination that Berglund's testimony was inconsistent with these medical records. *See Carter*, 574 N.W.2d at 730 ("Substantial evidence means more than a scintilla of evidence" and must be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (Quotation omitted.)).

In her initial decision, the ULJ found that Berglund made "some efforts" to control her chemical dependency, but nonetheless denied her unemployment benefits. The primary basis for the ULJ's decision was based on an error of law, that a total cessation of alcohol use was necessary in order to find "consistent efforts," and on unsubstantiated findings that Berglund had increased her level of alcohol consumption during the five months prior to her discharge and had failed to attend an inpatient or outpatient treatment

13

program that had been recommended by her treatment providers. In her order of affirmation, the ULJ found that there was insufficient evidence that Berglund made "any effort" to cease her consumption of alcohol during any period and was critical of Berglund's treatment providers and their recommendations or lack of recommendations. The ULJ failed to explain why she found that Berglund made "some efforts" to control her chemical dependency in the initial decision, but then determined that she did not make "any effort" to control her chemical dependency in the order of affirmance.

Although Berglund's treatment providers perhaps should have recommended that she attend a formal inpatient or outpatient treatment program, it is not the role of the ULJ or this court to second-guess the treatment recommendations of medical and mental-health professionals. Rather, the ULJ's charge was to determine whether Berglund made consistent efforts to control her chemical dependency, which would include a determination of whether she had cooperated with her treating physician and psychologist and followed up with their recommendations during the five months prior to her discharge from employment. Although Berglund had a relapse, which resulted in her discharge, there was no evidence that she failed to cooperate with her treatment professionals or failed to follow up with any recommended treatment. And, consistent with the goals set out for her by her psychologist, she decreased her consumption of alcohol over the five-month period prior to her discharge from employment. The ULJ erred by focusing upon Berglund's results, rather than her efforts, and the ULJ's conclusion that Berglund failed to make consistent efforts to control her chemical dependency is not supported by substantial evidence. Because Berglund meets the

14

chemical-dependency exception to the employment-misconduct rule, we determine that she is entitled to unemployment benefits as a matter of law. *See Irvine*, 779 N.W.2d at 103.

**Reversed.**